NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

COLUMBIA TRIBUNE PUBLISHING
COMPANY, Respondent.

No. 73-1259.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 13, 1973.

Decided April 22, 1974.

John H. Ferguson, Atty., N.L.R.B., Washington, D. C., for petitioner.

Terence C. Porter, Porter & Cleaveland, Columbia, Mo., for respondent.

Before MEHAFFY, Chief Judge, MOORE,* Senior Circuit Judge, and WEBSTER, Circuit Judge.

MOORE, Circuit Judge.

This case is before the court on application of the National Labor Relations Board pursuant to § 10(e) of the National Labor Relations Act, 29 U.S.C. § 151 et seq. (1970), for enforcement of its order against the Columbia Tribune Publishing Company which it has found guilty of violating § 8(a)(5) and (1) of the Act by failing to bargain in good faith with the Columbia Typographical Union No. 160 and § 8(a)(3) and (1) of the Act by refusing to reinstate unfair labor practice strikers upon their unconditional offer to return to work.

The *Columbia Daily Tribune,* owned by the Tribune Publishing Company, is a daily newspaper of general circulation in Columbia, Missouri. For more than thirty years the Columbia Typographical Union No. 160 of the International Ty-

* LEONARD P. MOORE, Senior Circuit Judge of the United States Court of Appeals for the Second Circuit, sitting by designation.

pographical Union has been the collective bargaining representative for the company's composing room employees. The latest contract between the union and the company expired on March 31, 1971.

Until April 1, 1971, the type for the *Columbia Daily Tribune* was set exclusively by the "hot metal process." This is a fairly complicated method whereby skilled composing room employees cast lines of type in molten lead, assemble those lines by hand into a complete page and send the page on to the pressroom where the pressmen, workers represented by a different union, make up the press plates which actually print the newspaper.

During the fall of 1970, it became apparent to the *Tribune's* management that the newspaper's expanding requirements could not be met if the paper continued to rely on the cumbersome hot metal process. Subsequent to April 1, the company, although intending to continue to use the hot metal process in the production of classified ads, began employing a new technique, the cold type or photo composition process, for the production of most of the type used in its paper. "Cold type" is a process by which type is prepared by simply pasting printed material on a mat which in turn is photographed in a manner that transfers the image to a metal plate which when exposed to acid is etched into a finished plate ready for the pressroom. The cold type process eliminates the highly complicated linotype procedure. Consequently, it does not require any of the skilled labor necessary to the hot metal process.

On January 18, 1971, Henry J. Waters, III, publisher and chief operating officer of the newspaper, summoned seven of the approximately twenty-eight composing room employees to his office to inform them of the changes to be made at the *Tribune*. Waters told the seven employees that he expected to re-

duce the number of composing room employees by about half and that although these seven, the most senior of the employees, might expect to earn $3 an hour under the new process, others would be paid less depending on what function they performed and how well they performed it.[1]

Neither the president of the Typographical Union nor any other union official was formally notified of this meeting although one of the seven employees at the meeting happened to be the shop steward in the composing room. After learning of the meeting, Union Local President Ronald Ott insisted that the company hold a similar meeting for the entire composing room staff. On February 10, 1971, the company held such a meeting.

On February 19, 1971, after some of the new cold type equipment had arrived, Alfred Shaw, the newly elected president of the local union and successor to Ronald Ott, urged the union members to practice the cold type procedure on their own time on the newly acquired machinery. Prior to March 1, various union officials had requested the company to make the new equipment available to the composing room employees. Although the company assured the union that such access would be permitted, it gave various excuses to forestall any immediate implementation. Similar inaction prevailed through the first two weeks of March 1972. Finally, on March 17, the union heatedly protested the company's failure to make the new equipment available to its existing employees or to offer them opportunities for retraining. As a result of this protest, the company permitted the employees to practice on the new equipment on Friday, March 19, and Sunday, March 21.

Meanwhile, on February 28 and March 1, the *Tribune* had advertised employment opportunities seeking "typists" and "newspaper production trainees."

---

1. Under the expiring contract all the composing room employees were receiving $4.33 an hour, regardless of their function.

As a result of these ads, the company interviewed various applicants and on Thursday, March 11, it hired seven or eight new employees and promptly began training them in the new cold type process.

Before their current contract expired on March 31, 1972, the parties held nine bargaining sessions and thereafter, on April 16 and September 8, the parties had two further meetings in which there was significant discussion of contract issues. At these meetings the union initially proposed to continue the previous contract while improving wages and fringe benefits. The company's initial counterproposal, on the other hand, proposed major alterations in the traditional relationship between the *Columbia Daily Tribune* and the Typographical Union. First, the company's counterproposals on wages and hours merely restated the requirements of the Fair Labor Standards Act, 29 U.S.C. §§ 206(a)(1), 207(a) (1), *viz.*, that the employees should receive no less than $1.60 an hour and that they should be paid time and one half for all time worked in excess of forty hours weekly. Second, the company's counterproposal eliminated provisions in the existing contract which defined the foreman's authority to discipline employees and which provided for union participation in the review of discharge decisions challenged by employees, replacing them with a "management's rights" clause. Finally, and most significantly, the counterproposal omitted any clause, such as that in the existing contract, (1) recognizing the union as exclusive bargaining representative of the composing room employees and (2) providing that all composing room work was within the jurisdiction of the union and could only be performed by union members. The company maintained that the existing jurisdiction-unit clause did not afford it sufficient "flexibility" and that it needed the freedom to assign composing room work to ad salesmen, society and entertainment page editors, and other similar persons who were not regularly employed in the composing room.[2]

By the fourth and fifth bargaining sessions, on March 16 and 17, the parties gave the appearance of being deadlocked on the jurisdiction-unit issue. The union felt that unless the employees were assured the exclusive right to perform unit work, the other terms of the collective bargaining agreement, including the wage scale, "wouldn't mean a thing." Trial Examiner's Decision, Appendix, at 20. By the ninth and final pre-strike meeting between the parties, the company agreed to include the existing jurisdiction-unit clause as long as it was limited to "hot metal employees," a limited concession in view of the fact that the newspaper was changing almost exclusively to a cold type process. The union rejected this offer. Finally, the company said that it would agree to the continuation of the existing jurisdiction-unit clause if a proviso were added to the effect that anyone could perform the work. The union likewise rejected this proposal on the ground that such a proviso was internally inconsistent with any jurisdiction clause and would completely nullify it. On April 16 the com-

2. In response to questioning by the Trial Examiner, below Publisher Waters elaborated on the *Tribune's* desire for flexibility.

Waters: [T]he new process * * * was the same kind of work [presently] done by many, many people in the plant. * * * The new process, of course, involved, as we saw here, photoproduced matter, right reading, the kind of elements that all advertising people had been using all along to make ad layouts, the same kind of elements that people involved in editorial make-up had been using all along to make editorial summaries, dummies. For this reason we felt it imperative the new process could not be properly taken advantage of unless the company had flexibility of using matter produced by people all over the plant which was because of the nature of the new process camera ready or already produced without having to do that duplicated or have a generic function in the other departments listed in a contract with the Typographical Union or any other group.

T. at 292-94.

pany reverted to its original position and demanded that the union agree to eliminate altogether the jurisdiction-unit clause appearing in the previous contract.

On various occasions when the contract negotiations were becoming snarled on the jurisdiction-unit issue, the union suggested that the parties move on to consider wages and other matters. Publisher Waters, however, resisted these union efforts to break the deadlock on the jurisdiction-unit issue and maintained that there was no use in discussing "wages or anything else" until the parties first came to agreement on the jurisdiction-unit issue. *See* Trial Examiner's Decision, Appendix, at 19. On March 23, Publisher Waters responded to the union's efforts to discuss wages with the statement that "wages would be a matter solely between him and the individual employee concerned and that he (Waters) alone would decide whether the employee should receive an increase * * *." Trial Examiner's Decision, Appendix, at 26.

On the evening of March 31, the union's negotiating team reported to the membership that the company had "made a complete farce out of our negotiations"; that in consequence no agreement had been reached; that they did not know what the wages, hours or other working conditions would be nor how the employees stood in relation to the newly hired employees; and that they did not know how many employees would be needed to work in the new process. Trial Examiner's Decision, Appendix, at 28. The employees thereupon voted to strike and the next day began picketing the company. Using the newly hired employees, supervisory personnel, and help from other departments, the newspaper continued operations.

After an abortive attempt to settle the strike on April 16, 1972, the union filed unfair labor practice charges against the company and a complaint issued. Four months later, on August 26, the parties entered into an informal settlement which was approved by the Board's Re-

gional Director. Under the terms of the agreement, the company agreed that upon their unconditional offer to return to work, it would offer the striking employees "immediate and full reinstatement to their former jobs, or if their jobs no longer exist, to substantially equivalent positions," discharging if necessary those employees who replaced the strikers. Trial Examiner's Decision, Appendix, at 30. On September 8, the union presented the company with a list of fourteen named employees who offered to return to work. Publisher Waters, however, stated that he only had two hot metal jobs available, those needed to set the classified ads, and he took the position that the approximately fourteen cold type positions were not substantially equivalent jobs to which the strikers were entitled under the terms of the settlement agreement. On September 15, the company offered the two most senior strikers reinstatement as hot metal printers, and advised all but two of the remaining strikers that because all hot metal positions were then filled, they would be placed on a preferential hiring list. However, one of the strikers, Mike Naughton, was informed that the company declined to reinstate him because of his "conduct during the strike," and another striker, Jim Epperson, was denied reinstatement on the grounds that he had failed to appear for work for two months prior to the strike. The company never elaborated upon the nature of Naughton's alleged misconduct and no evidence of any misconduct was adduced at the hearing. With respect to Epperson, the union introduced evidence at the hearing to the effect that his absence had been due to illness.

None of the union members accepted the company's offer of the two hot metal positions. On September 16, 1972, the union filed new unfair labor practice charges and thereafter the Regional Director issued a complaint against the company.

On the foregoing facts the Board found that the company had violated § 8(a)(5) and (1) of the Act by refusing

to incorporate in any agreement a description of the appropriate bargaining unit to be represented by the union and by otherwise failing to bargain in good faith. Further, the Board attributed the strike to the company's unfair labor practices and held the company in violation of § 8(a)(3) and (1) of the Act by failing promptly to reinstate the striking employees upon their unconditional offer to return to work on September 8.

The Board order requires the company to cease and desist from the unfair labor practices found and from any like or related behavior that interferes with its employees' exercise of their Section 7 rights. The Board order also requires the company: to bargain in good faith with the union; to offer James Epperson and Michael Naughton immediate reinstatement to their former jobs or, if those jobs no longer exist, to cold type jobs; to offer the remaining twelve strikers reinstatement to their former jobs or, if those jobs no longer exist, to cold type positions upon their renewed unconditional application for such reinstatement (at the present rate being paid for composing room work); to make the fourteen strikers whole for any losses they may have suffered by reason of the discrimination against them, i. e., by payment of back pay computed on the basis of a $4.33 hourly rate and a 37½ hour work week, the conditions of employment at the time the employees became unfair labor practice strikers. NLRB Decision and Order, February 1, 1973, Appendix, at 59–62, and if any employees remain for whom no positions are available, the employer must place such employees on a preferential hiring list with priority in accordance with some traditional non-discriminatory criterion and thereafter offer them reinstatement as such employment becomes available before other persons are hired. NLRB Order Amending Decision and Order, February 8, 1973, Appendix, at 65.

 The core issue in this dispute is whether the Tribune Publishing Company is guilty of refusing to bargain in

good faith. The determination that a party has failed to bargain in good faith must, in the first instance, be made by the National Labor Relations Board. In affirming the decision of its trial examiner, the Board found that the conduct of the employer before and during the collective bargaining negotiations proved that it was not meeting its obligation under the National Labor Relations Act. This court can set aside the Board's decision only "when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." Universal Camera Corporation v. N. L. R. B., 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951).

Section 8(a)(5) of the National Labor Relations Act, as amended, 29 U.S.C. § 158(a)(5) (1970), makes it an unfair labor practice for an employer to refuse to bargain collectively over those subjects, *viz.*, "wages, hours, and other terms and conditions of employment," stipulated in § 8(d) of the Act. 29 U.S.C. § 158(d) (1970). In Fibreboard Corporation v. N. L. R. B., 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), the Supreme Court held that an employer had violated the Act by refusing to bargain with the union over his decision, reached because of economic considerations, to subcontract maintenance work that had previously been the exclusive responsibility of the unit members. The Court found that: "The subject matter of the present dispute is well within the literal meaning of the phrase 'terms and conditions of employment.'" 379 U.S., at 210, 85 S.Ct., at 403. According to the Court, when an employer desires to effect cost savings by contracting out work that had been the responsibility of the union members, it is under an obligation to first "attempt to achieve similar economies through negotiation with existing employees or to provide them with an opportunity to negotiate a mutually acceptable alternative." 379 U.S., at 214, 85 S.Ct., at 404.

While the facts in *Fibreboard* specifically dealt with a case in which the employer had subcontracted work previously done by unit members, there seems to be no reason why its rationale should not apply equally where, for financial reasons, an employer has decided to eliminate unit jobs completely. The Board has found the analogy compelling and has held that:

> [T]he elimination of unit jobs, albeit for economic reasons, is a matter within the statutory phrase "other terms and conditions of employment" and is a mandatory subject of collective bargaining within the meaning of Section 8(a)(5) of the Act.

Town & Country Mfg. Co., 136 N.L.R.B. 1022 (1962), *enforced*, 316 F.2d 846 (5th Cir. 1963).

The Board reiterated its position in Rochet d/b/a The Renton News Record, 136 N.L.R.B. 1294 (1962), a case strikingly similar to the one at bar. In that case a group of newspapers, "[i]n order to meet the demands of increased competition and expanding markets," 136 N. L.R.B., at 1295, decided, *inter alia*, to switch from the hot type composing process to cold type composition. The employers were found in violation of § 8(a)(5) and (1) of the Act because they refused to bargain with the Seattle Typographical Union Local No. 202 "over the intended change of operations and its effect on the composing room employees." *Id.*, at 1296. In reaching its conclusion the Board observed that:

> The change in the method of operations in this case is the result of technological improvements. Obviously, such improvements serve the interests of the economy as a whole and contribute to the wealth of the Nation. Nevertheless, the impact of automation on a specific category of employees is a matter of grave concern to them. It may involve not only their present but their future employment in the skills for which they have been trained. Accordingly, the effect of automation on employment is a joint responsibility of employers and the representatives of the employees involved.

*Id.*, at 1297.

There is one substantial difference between the instant situation, where unit jobs are put into jeopardy by the advance of automation, and the *Fibreboard* case where the jobs were threatened by a subcontracting arrangement. In the latter instance the bargaining unit, even though it was on the verge of dissolution, was nonetheless delineated by static and acknowledged boundaries. By contrast, one of the inherent by-products of automation is a blurring of the bargaining unit boundaries.

This added complexity has arisen in the case at bar where each side accuses the other of attempting unilaterally to alter the boundaries of the bargaining unit. Management contends that the union is attempting to assume jurisdiction over "newly created" photo composition positions, while the union claims that the company is trying to wrench from its control legal jurisdiction over the composing room.

■ The Board, however, has consistently held that the hot metal and cold type processes are merely two different methods of fulfilling the traditional composing room function of transforming raw copy into printed copy, and that the skills required for the cold type process, though "to some extent modified," are in many respects "substantially equivalent to those found in traditional 'hot metal' composing rooms." Frye & Smith, Ltd., 151 N.L.R.B. 49, 51–52 (1965).[3] In the instant case the Board held that:

> [T]he composing room unit is an appropriate unit for the purposes of

---

3. The Board has had a great deal of experience in resolving disputes of this type. *See*, J. A. Jones Constr. Co., 135 N.L.R.B. 1402 (1962). *See also*, Cleveland Newspaper Guild, 191 N.L.R.B. 236 (1971); Platt, "The Duty to Bargain as Applied to Management Decisions," 19 Labor L.J. 143 (1968).

collective bargaining and that the conversion by the Respondent of this operation from a hot metal to a cold type process neither impaired the appropriateness of the unit nor the union's representative status.

NLRB Decision and Order, February 1, 1973, Appendix, at 57–58. It would seem indisputable, therefore, that the technological change brought to the composing room operation was an issue requiring discussion between management and the union which had jurisdiction over the composing room: in this case, the Columbia Typographical Workers Union No. 160.

■■ Because the effect of automation on the bargaining unit was a mandatory subject of collective bargaining, the employer had a statutory duty to confer in good faith with the union over the issue. It has long been recognized that while this duty does not compel either side to make concessions or to yield any positions fairly maintained, it does require the parties to bargain "with an open mind and sincere intention to reach an agreement consistent with . . . . ." Sign & Pictorial Union Local 1175 v. N. L. R. B., 136 U.S.App.D.C. 144, 419 F.2d 726, 731 (1969). *Accord,* N. L. R. B. v. Holmes Tuttle Broadway Ford, Inc., 465 F.2d 717, 719 (9th Cir. 1972); N. L. R. B. v. Wonder State Manufacturing Co., 344 F.2d 210, 215 (8th Cir. 1965). *See also,* H. K. Porter Co. v. N. L. R. B., 397 U.S. 99, 106, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970); N. L. R. B. v. American National Insurance Co., 343 U.S. 395, 404, 72 S.Ct. 824, 96 L.Ed. 1027 (1957).

■ Whether a party is chargeable with an overall failure to bargain in good faith "involves a finding of motive or state of mind," which must be inferred from the evidence viewed as a whole. N. L. R. B. v. Reed & Prince Manufacturing Co., 205 F.2d 131, 139–140 (1st Cir.), cert. denied, 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953). There is substantial evidence found in the employer's conduct both at and away from the bargaining table to suggest that he did not bargain in good faith and, indeed, may even have been motivated by anti-union animus.

At the bargaining table there was substantial evidence to indicate that management, in discussing the jurisdiction-unit issue, was engaged "in the dilatory tactics traditionally associated with 'surface bargaining,'" Sign & Pictorial Union Local 1175 v. N. L. R. B., *supra,* 419 F.2d at 738–739, and thereby foreclosed negotiation on a mandatory subject of bargaining. At one point in the negotiations the employer offered to accept the union's jurisdiction over "hot metal" employees. Another time it agreed to union jurisdiction over the composing room as long as it could assign anyone in its employ to do composing room work. Both of these "concessions", the only bargaining on the issue undertaken by management, were patently meaningless.

■ Before the old contract expired, the Tribune Publishing Company delayed making the new photo composition equipment available to the composing room employees for training in preparation for the transition to the cold type process while soliciting, hiring and training new employees for the photo composition work. On various occasions, when discussing the changeover with composing room personnel, the company by-passed the union. Its actions could well be interpreted as an attempt to demean the union's authority. *See,* N. L. R. B. v. General Electric Company, 418 F.2d 736, 759 (2d Cir. 1969), cert. denied, 397 U.S. 965, 90 S.Ct. 995, 25 L.Ed.2d 257 (1970). This conduct further underscores the likelihood that the company lacked good faith in its negotiations with the union.

The Board's finding that the employer failed to bargain in good faith and was therefore in violation of § 8(a)(5) and (1) of the Act, is based on substantial evidence.

Where an employer's refusal to bargain in good faith is a factor contributing to a strike, then, notwithstanding that other issues may also be involved, the strike is an unfair labor practice strike, and the employer is required to reinstate the strikers upon their unconditional offer to return, even if it is necessary to displace the strikers' replacements to do so. *See,* Mastro Plastics Corporation v. N. L. R. B., 350 U.S. 270, 278, 76 S.Ct. 349, 100 L.Ed. 309 (1956); N. L. R. B. v. Imperial Outdoor Advertising, 470 F.2d 484, 486 (8th Cir. 1972); N. L. R. B. v. Cast Optics Corporation, 458 F.2d 398, 407 (3d Cir.), cert. denied, 409 U.S. 850, 93 S.Ct. 58, 34 L.Ed.2d 92 (1972). Here the union's strike vote was prompted by its negotiating committee's report that the company had "made a complete farce out of our negotiations." At a minimum the company's bad faith bargaining was "a factor leading to the strike." N. L. R. B. v. Imperial Outdoor Advertising, *supra,* 470 F.2d at 486. It follows, therefore, that when on September 4, 1972, the union, on behalf of the strikers, made an unconditional offer to return to work on September 8, the company was obliged to offer the strikers (or at least as many of them as were necessary to operate the composing room under the cold type process), including Mike Naughton and Jim Epperson, reinstatement and that its failure to do so violated § 8(a)(3) and (1) of the Act.

In spite of the fact that the company was guilty of an unfair labor practice, the remedy resulting therefrom is not easily resolved. The strike coincided in point of time with the technological change-over from the "hot" to "cold" typesetting process. The informal settlement of August 26th approved by the Board's Regional Director provided that the company would offer to the employees who had gone out on strike on or about April 1, 1971, reinstatement to their former jobs "or if those jobs no longer exist," to "substantially equivalent positions." If there were not sufficient jobs for all returning strikers, they were to be placed, in accordance with seniority, on a preferential hiring list of "employees who cannot be reinstated at the time of their offer."

Disputes as to reinstatement arose and, on September 16th, the union filed new unfair labor practice charges. The Regional Director thereafter withdrew his approval of the settlement. Thus, several questions remain unresolved: what jobs are open; who is entitled to reinstatement having due regard to seniority; and what wages should be paid. The strikers were entitled to such cold type jobs as were available after the change-over and are entitled to such in preference to any replacements hired to fill cold type jobs, even if it is necessary to dismiss such replacements. The Board recognized that technological change required the strikers, upon reinstatement, to be paid, not at the old flat rate of $4.33 per hour, but rather at the lower rate presently "being paid for the composing room work." Decision and Order, Appendix, at 59. The Board's decision was based on the fact that "the cold type process may require lesser skills than those exercised in the hot metal process and the Respondent may be economically justified in paying lower rates." *Id.,* at 58–59. Nevertheless, the Board ordered back pay to be awarded to the unfair labor practice strikers at the old contract rate, ignoring the fact that the new, less demanding photo composition technique apparently became operative at the beginning of the strike when the unskilled replacements took over the duties of the union members.

The amount which serves as the basis for the back pay award is the amount which the employee discriminated against would have earned but for the discriminatory act. It is grounded upon the rate of compensation normally to be expected during the period. *See,* e. g., F. W. Woolworth Co., 90 N.L.R.B. 289 (1950). Under the circumstances

the rate of pay to be used in enforcing the Board's make-whole order must be computed on the basis of earnings of employees engaged in cold type work. *See,* Charley Topping & Sons, Inc., 151 N.L.R.B. 1638 (1965), *enforced,* 358 F. 2d 94 (5th Cir. 1966). *See also,* East Texas Steel Castings Co., 116 N.L.R.B. 1336 (1956). Apparently, this wage rate will not be a single flat rate paid to all employees, rather it will vary with skill and experience, averaging $2.25 per hour for the period in question. Trial Examiner's Decision, Appendix, at 11. Likewise, the back pay award may not necessarily be computed on the basis of a 37½ hour work week, the work week under the expired contract. Rather, it must be based on the work week that would have been worked by the strikers during the relevant period. Finally, back pay can only be awarded to those claimants who would have worked during the period but for the discriminatory practices of the employer. NLRB policy does not require awarding back pay except from the respective dates when each claimant would have been recalled on the basis of seniority and the availability of work. N. L. R. B. v. Robinson Freight Lines, 289 F.2d 937 (6th Cir. 1961). *See, also,* N. L. R. B. v. American Creosoting Co., 139 F.2d 193 (6th Cir. 1943). Thus, if the transition to the photo composition process eliminated the need for some of the employees formerly required by the hot type method, those employees are not entitled to any award of back pay.

We find that the Board's determinations of the employer's violations are in harmony with the evidence and we therefore enforce the Board's order except that we believe that reinstatement should be ordered according to the jobs required under the cold type process and that the Board should not compute back pay on the basis provided by the expired labor contract. We remand to the Board its make-whole order so that it may compute the award in a manner consistent with this opinion.