RADISSON PLAZA MINNEAPOLIS,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Hotel Employees and Restaurant Employees International Union, Local 17;
Teamsters Local No. 638; AFL–CIO,
Intervenors.

RADISSON PLAZA MINNEAPOLIS,
Respondent,

Hotel Employees and Restaurant Employees International Union, Local 17;
Teamsters Local No. 638; AFL–CIO,
Intervenors,

v.

NATIONAL LABOR RELATIONS
BOARD, Petitioner.

Nos. 92–2103, 92–2253.

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 16, 1992.

Decided March 15, 1993.

Arch Y. Stokes, Atlanta, GA, argued, for Radisson Plaza.

Steven D. Gordon, Minneapolis, MN, argued, for Teamsters Local.

Fred L. Cornell, N.L.R.B., Washington, DC, argued, for N.L.R.B.

Before WOLLMAN and MORRIS SHEPPARD ARNOLD, Circuit Judges, and BATTEY,* District Judge.

WOLLMAN, Circuit Judge.

The Radisson Plaza Minneapolis ("Radisson") appeals from the decision and order of the National Labor Relations Board; the Board cross-appeals for enforcement of its order. We affirm and order enforcement of the Board's decision.

I.

Radisson's parent corporation operates hotels throughout the world. Prior to 1981, the parent corporation operated a ho-

* The HONORABLE RICHARD H. BATTEY, United States District Judge for the District of South Dakota, sitting by designation.

tel in downtown Minneapolis, whose employees were jointly represented by Hotel Employees and Restaurant Employees, Local 17, AFL–CIO, and Teamsters Local No. 638, AFL–CIO (the "unions"). In 1981, the parent corporation closed and eventually demolished that hotel, replacing it with a new hotel that opened in March 1987.

Shortly thereafter, the unions solicited Radisson's new employees to sign union authorization cards. Radisson agreed voluntarily to recognize and bargain with the unions if a card check established that they represented a majority of employees. A mediator conducted this card check in June 1988 and found that a majority of the employees had signed valid cards. Radisson then recognized the unions and, on July 29, 1988, commenced contract negotiations with them. , Radisson's principal negotiator was attorney Arch Stokes; he was assisted by Radisson's Personnel Manager Brian Langager and General Manager John Kelly. The unions' principal negotiator was Local 17's international vice-president, Dale Stormer; he was assisted by Local 17 organizer Anne Theurer and Secretary–Treasurer Dan Kuschke.

The parties' second meeting occurred on August 12, 1988. The unions proposed that the parties adopt the terms of the "area agreement," a contract between Local 17 and four other Minneapolis area hotels. Stokes rejected the proposal and asserted that any agreement would have to address the "peculiarities" of Radisson and should be based on its parent company's employee handbook (the "handbook"). Radisson's parent company distributes the handbook, which addresses a variety of working conditions, to all of its hotels. The handbook sets forth a merit pay system provision to govern employee wage increases above the base wage rates that Radisson maintains for different job classifications. The merit pay provision is accompanied by an illustration of a pay envelope marked "TOP SECRET" and states that an employee's pay "is determined individually, is confidential, and shouldn't be discussed with anyone" other than management. The handbook also contains a paragraph stating: "[t]he company reserves the right to amend, modify or discontinue any of the information or benefits contained herein."

After proposing that the parties use the handbook as a starting point for their negotiations, Stokes discoursed at length about various collateral topics, including his reflections concerning a book written by former Secretary of Health, Education and Welfare Joseph Califano about health care. At another point during the meeting, Stokes questioned whether a majority of employees actually supported the unions. Although the meeting was scheduled to last until 3:00 p.m., Stokes adjourned it at 12:30 p.m.

After Stokes cancelled the next meeting, originally set for August 22, the parties agreed to meet on August 31. This meeting was no more productive than the first, with Stokes rejecting the unions' tender of the area agreement and two other contracts covering hotels in Minneapolis and San Francisco as possible starting points for the Radisson contract. Stokes again questioned whether a majority of the employees supported the unions and cancelled the bargaining session scheduled for September 6.

In September, Radisson unilaterally changed job assignments and schedules of some bargaining unit employees. In response, union organizer Theurer wrote to Radisson requesting that Radisson bargain concerning those changes. Radisson did not respond to the letter. In late October, Theurer called Radisson's General Manager Kelly and reiterated her request to bargain concerning the changes. Kelly replied that Radisson refused to bargain over those changes until the parties had a contract, and stated that any affected employees could meet with him "individually" if they desired.

The parties held the next two bargaining sessions on September 29 and 30, 1988. At these sessions, Stokes proposed including the entire handbook in the contract. Stokes also discoursed at length about investigations allegedly linking Local 17's international affiliate to corrupt activities.

Stokes remarked that Local 17 was "a joke" and invited it to "walk out."

In late October, Stokes cancelled a bargaining session scheduled for November 30 and scheduled a meeting for January 11, 1989, the next date on which Stokes said that he was available. Shortly after the January 11 session opened, Stokes informed the unions that he was unavailable to meet again until February 23. Stormer, on behalf of the unions, replied that the unions were available the following week and that Stokes's purported unavailability was "ridiculous." Nonetheless, Stokes stood by his refusal. The parties met again on February 23 and 24. At the February 24 meeting, Stokes stated that he would be unavailable to meet until March 10, declined the unions' request for an earlier date, and adjourned the meeting at 1:00 p.m., in advance of the scheduled 3:00 p.m. adjournment time.

On March 7, the unions published a newspaper advertisement chronicling the alleged difficulties of a Radisson employee in obtaining a leave of absence during her pregnancy and accusing Radisson of hiring a "union buster"—presumably a reference to Stokes. At the March 10 meeting, Stokes called the ad "slanderous" and "libelous." Stokes proposed that any contract be ratified by two-thirds of all eligible voters. The unions rejected this proposal.

In a letter dated March 14, Stormer asked Radisson to furnish an updated list of employees' names, addresses, job classifications, and wage rates. Radisson did not respond.

On March 16, Radisson unilaterally increased the base wage rates of sixty-five unit employees without notifying the unions. In early April, after being informed of the raises by several employees, Theurer asked Radisson to bargain over the increases. Radisson refused her request.

On March 27, the parties met again to discuss Radisson's new contract proposals, which it had disseminated in mid-March. Union negotiator Kuschke specifically rejected the "preamble" in Radisson's new offer. The preamble would have (1) allowed Radisson to require the unions to prove their majority status during each year of the new contract and (2) allowed Radisson to cease bargaining if either of the unions were found to be "dominated by organized crime." The session resulted in little progress. The next session, held on March 28, was similarly unproductive. Stokes adjourned the meeting, scheduled to last until 3:00 p.m., at 11:45 a.m.

Sometime in March 1989, Bob Ogren, an engineer in Radisson's maintenance department, circulated a decertification petition among employees in the bargaining unit. He obtained eighty-seven signatures of the 165 employees alleged in the petition to be in the unit at that time. He then filed the petition with the Board's Regional Office on March 24. It is undisputed that Ogren acted without the assistance of Radisson's management.

On April 27, Kuschke requested in writing that Stokes continue bargaining and comply with the unions' March 14 information request. Stokes replied, in a letter dated May 8, that because employees had filed a decertification petition with the Board, the Company had a "good faith doubt" concerning the unions' majority status and declined to bargain further at that time.

Shortly thereafter, in May 1989, employee John McDonald visited the office of his supervisor, Lisa Wyland, whom he found speaking on the telephone. According to McDonald's later testimony, he heard Wyland state that she had recently refused to hire several applicants because she believed that they were "union plants." McDonald heard Wyland repeat this allegation to other supervisors and employees in several other conversations over the next few days.

On November 7, 1989, in response to Radisson's continued refusal to bargain, the unions conducted an employee poll in front of the hotel to determine whether the employees would support a public boycott of Radisson. About ten minutes after polling began, Radisson General Manager Kelly approached with another supervisor and asked the union representatives how the ballots would be counted and whether a

management representative could observe the balloting. Four other supervisors also intruded on the proceedings with sundry requests, which ranged from asking whether they could cast votes to inquiring about the unions' procedure for employees unschooled in English, to examining voter lists. According to testimony at the administrative hearing, at least six employees approached the polling area, but walked away upon viewing the Radisson supervisors.

The unions filed charges with the Board, alleging numerous violations of the National Labor–Management Relations Act (the Act). The case was heard in front of an Administrative Law Judge (ALJ), and his decision was appealed to the Board. Based on the foregoing facts, the Board found, in agreement with the ALJ, that Radisson had violated Sections 8(a)(5), (1) of the Act (29 U.S.C. §§ 158(a)(5), (1)): (1) by refusing to bargain with the unions concerning employee wage increases and changes in job assignments; (2) by refusing the unions' request for information relevant to collective bargaining negotiations; (3) by bargaining in bad faith with the unions; and (4) by improperly withdrawing recognition from the unions. The Board also found, in agreement with the ALJ, that Radisson had violated Section 8(a)(1) of the Act: (1) by telling employees that it would reject job applicants suspected of being union adherents, and (2) by harassing and engaging in surveillance of employees engaged in union activity. The Board further found, in disagreement with the ALJ, that Radisson had violated Section 8(a)(1) of the Act by maintaining a rule in its employee handbook that prohibited employees from discussing their wages with anyone other than management.

The Board's order requires Radisson to cease and desist from the listed unfair labor practices and from in any like or related manner interfering with, restraining, or coercing employees in the exercise of their statutory rights. Additionally, the Board's order requires Radisson to recognize and bargain with the unions upon request, to furnish the unions with the information they had requested, to rescind the unlawful rule in the handbook, and to post an appropriate notice detailing the contents of the Board's order.

## II.

Radisson raises three issues on appeal. It claims that (1) the record as a whole does not contain substantial evidence to support the finding that Radisson failed to bargain in good faith; (2) the ALJ and the Board committed reversible error by refusing to credit Radisson's notes of the bargaining sessions; and (3) the ALJ and the Board erred in finding that Radisson's conduct had tainted the employees' decertification petition.

■ We will enforce an order of the National Labor Relations Board if it has correctly applied the law and if substantial evidence in the record supports its findings. *Litton Microwave Cooking Prods. v. NLRB*, 949 F.2d 249, 251 (8th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1669, 118 L.Ed.2d 390 (1992); *see also Hall v. NLRB*, 941 F.2d 684, 687–88 (8th Cir.1991). With this standard of review in mind, we turn to the three issues raised by Radisson on appeal.

Radisson's first argument is that there is not substantial evidence on the record as a whole to support the finding that Radisson failed to bargain in good faith.

■ Section 8(a)(5) of the Act makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees...." Section 8(d) of the Act defines the duty to bargain collectively as the mutual obligation of the employer and union "to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement...." Although the duty of bargaining in good faith does not require that the parties make particular concessions, it envisions "a sincere, serious effort to adjust differences and to reach an acceptable common ground." *NLRB v. Blevins Popcorn Co.*, 659 F.2d 1173, 1187 (D.C.Cir.1981). Thus,

an employer engages in bad faith or surface bargaining by conducting negotiations "as a kind of charade or sham, all the while intending to avoid reaching an agreement...." *Continental Ins. Co. v. NLRB*, 495 F.2d 44, 48 (2nd Cir.1974).

In determining the existence of bad faith bargaining, we examine "the employer's conduct in the totality of the circumstances in which the bargaining took place." *NLRB v. Billion Motors, Inc.*, 700 F.2d 454, 456 (8th Cir.1983). Moreover, we have noted that "[t]he Board not only looks to the employer's behavior at the bargaining table but also to its conduct away from the table that may affect the negotiations." *Id.* We have recognized that "[t]he question of good faith bargaining is for the Board's expertise more than ours." *Kellwood Co. v. NLRB*, 434 F.2d 1069, 1074 (8th Cir.1970), *cert. denied*, 401 U.S. 1009, 91 S.Ct. 1257, 28 L.Ed.2d 544 (1971). Consequently, we will affirm a finding by the Board of an employer's bad faith bargaining if it is supported by substantial evidence on the record as a whole. *NLRB v. Columbia Tribune Publishing Co.*, 495 F.2d 1384, 1389 (8th Cir.1974).

The Board based its finding that Radisson failed to bargain in good faith upon Radisson's engaging in unfair labor practices "away from the table," and surface bargaining during the sessions. We examine these contentions in turn.

The Board found that Radisson unlawfully refused to bargain with the unions concerning changes in employee working conditions. In September 1988, Radisson changed job assignments and schedules of some unit employees in September 1988. In March 1989, Radisson unilaterally increased the base wage rate for sixty-five percent of unit employees. Radisson does not dispute that it rebuffed the unions' request for bargaining after the changes were made. Under the Act, wages, hours, and other terms or conditions of employment are mandatory subjects of bargaining, and any unilateral change in these items by a company, when accompanied by a refusal to deal with the incumbent union, constitutes a violation of the Act. *See*

*NLRB v. Local 264, Laborers' Int'l Union*, 529 F.2d 778, 785 (8th Cir.1976); *American Oil Co. v. NLRB*, 602 F.2d 184, 186 (8th Cir.1979).

Radisson responds that it bargained over the changes before it made them. Further, it argues that the wage increase was exempt from the duty to bargain because it was a continuation of an established company practice.

Radisson's first argument is without merit. Radisson cites evidence that the parties had generally discussed company policies on wages and working conditions during the negotiations. Mere evidence of company policies concerning employment conditions, without more, however, is not the equivalent of notice to the unions of specific changes or of bargaining to impasse over a specific proposal. Accordingly, Radisson may not claim that it bargained over the changes.

Second, Radisson's argument that the wage increase was exempt from the duty to bargain is misplaced. The Board applies this exemption only in cases where the wage increase is automatic and does not involve the exercise of a company's discretion. *NLRB v. Katz*, 369 U.S. 736, 746, 82 S.Ct. 1107, 1113, 8 L.Ed.2d 230 (1962). Here, the Board found that Radisson exercised substantial discretion in determining both the timing and amount of the increases. Radisson granted the increases at irregular intervals, and only after a preliminary determination that its budget and competitive requirements would sustain the increase. Consequently, the Board correctly found that the wage and schedule changes were mandatory subjects of bargaining and that Radisson committed an unlawful labor practice by unilaterally altering them without notification to the unions.

Moreover, Radisson does not contest two of the Board's findings: (1) that Radisson violated Sections 8(a)(5) and (1) of the Act by refusing the unions' March 14 request for information for an updated list of the unit employees' names, addresses, wages, and social security numbers and (2) that

Radisson and its parent corporation violated Section 8(a)(1) of the Act by maintaining a rule in its employee handbook prohibiting employees from discussing their wages with anyone other than management. Consequently, we accord these findings summary enforcement. *NLRB v. Mark I Tune–Up Center, Inc.*, 691 F.2d 415, 416 n. 2 (8th Cir.1982). Moreover, these findings remain relevant in determining whether Radisson bargained in bad faith. *U.S. Marine Corp. v. NLRB*, 944 F.2d 1305, 1314–15 (7th Cir.1991) (en banc), *cert. denied,* — U.S. ——, 112 S.Ct. 1474, 117 L.Ed.2d 618 (1992).

■ Thus, the Board properly found that Radisson's conduct away from the bargaining table supported an inference that Radisson failed to bargain in good faith. Radisson treated the unions as irrelevant with respect to issues of vital significance, including wage and schedule changes, and then refused to provide the unions with basic information concerning unit employees.

Likewise, Radisson's conduct during the bargaining sessions supported the Board's finding that Radisson engaged in surface bargaining. First, the Board found that Radisson's chief negotiator, attorney Stokes, engaged in a pattern of dilatory conduct. Stokes cancelled three bargaining sessions, terminated five of eleven meetings significantly earlier than planned, and refused the unions' requests for more frequent sessions without explaining why he was unavailable. *See Sparks Nugget v. NLRB*, 968 F.2d 991, 995 (9th Cir.1992). As a result, the parties had only eleven meetings over eight months.

Additionally, the Board found that Stokes had engaged in obstreperous conduct during the meetings calculated to deter consensus. First, Stokes engaged in frequent filibusters on collateral matters, such as Secretary Califano's book on health care, the nature of unions in Sweden, and the character of a hotel in Williamsburg, Virginia. Second, Stokes continually reminded the unions of their slim margin of victory, questioned whether they enjoyed majority support, and cited allegations of the unions' international affiliate's linkage to organized crime without any reference to how this purported affiliation was related to the negotiations.

Last, Stokes insisted on extreme gambits during bargaining sessions that the Board found supported the charge of surface bargaining. During the March 27 meeting, Stokes requested that the contract contain a clause relieving Radisson of its obligation to bargain should either of the unions be found to be "dominated by organized crime." Second, Stokes insisted at more than one meeting that the handbook form the basis for the agreement. The handbook contains a clause, however, permitting Radisson "to amend, modify or discontinue any of the information or benefits contained herein." In the light of this provision, the unions' acceptance of Stokes's proposal would have permitted Radisson to unilaterally change working conditions whenever it pleased or to require the union to renegotiate working conditions at its whim.

The use of such tactics by Radisson provide substantial evidence to support the Board's finding that Radisson engaged in surface bargaining during the negotiation sessions. Thus, the Board reasonably found that the totality of Radisson's conduct, both at and away from the bargaining table violated Sections 8(a)(5) and (1) of the Act.

■ Next, we address Radisson's claim that the ALJ and the Board committed reversible error in refusing to credit Radisson's notes of the bargaining sessions. Radisson argues that the ALJ's decision not to rely upon Radisson's notes after receiving both parties' notes of the bargaining meetings into evidence deprived it of its due process right to a fair hearing. Radisson claims that it failed to call witnesses to corroborate the content of its notes because it assumed that the ALJ would credit them once he had admitted them into evidence.

Section 10(e) of the Act (29 U.S.C. 160(e)) provides that "[n]o objection that has not been urged before the Board ... shall be considered by the [reviewing] court," ab-

sent a showing of extraordinary circumstances. Although Radisson included complaints about inferences the ALJ drew from the bargaining notes of both parties in the exceptions it filed with the Board, Radisson failed to raise this due process claim specifically. Because Radisson has shown no extraordinary circumstances justifying its failure to raise this claim, we will not address this claim, as it is not properly before us. *Wright Memorial Hospital v. NLRB*, 771 F.2d 400, 406 (8th Cir.1985).

Last, we address Radisson's claim that the ALJ and the Board committed reversible error in finding that the employees' decertification petition was tainted and that Radisson's withdrawal of recognition from the unions was unlawful.

■■■■ A union that is voluntarily recognized by an employer enjoys a presumption that it is supported by a majority of employees. *See NLRB v. Carmichael Constr. Co.*, 728 F.2d 1137, 1140 (8th Cir. 1984). An employer can rebut this presumption and refuse to bargain with an incumbent union if the employer can show that it has "a reasonable good faith doubt" as to the union's continued majority status, "based on objective considerations." *Bryan Memorial Hospital v. NLRB*, 814 F.2d 1259, 1262 (8th Cir.), *cert. denied*, 484 U.S. 849, 108 S.Ct. 147, 98 L.Ed.2d 103 (1987). An employer is not permitted, however, to rely on a union's loss of majority support caused by the employer's own unfair labor practices. *See NLRB v. American Linen Supply Co.*, 945 F.2d 1428, 1433–34 (8th Cir.1991).

■■■■ The employer must present clear and convincing evidence sufficient to warrant a good faith doubt of the union's majority. *Carmichael Constr. Co.*, 728 F.2d at 1139. Whether an employer meets its burden of demonstrating objective considerations sufficient to support its asserted good faith doubt is a question of fact; therefore, we must uphold the Board's determination if supported by substantial evidence on the record as a whole. *Id.*

■■ With respect to Ogren's petition, we have held that the filing of a decertification petition does not by itself provide sufficient basis for doubt about a union's continued majority status. *Bryan Memorial Hospital*, 814 F.2d at 1262. Moreover, Ogren's decertification petition originated in the context of the unfair labor practices committed by Radisson. These practices included surface bargaining in negotiations with the unions, unilateral schedule changes for a number of unit employees, and refusing to provide vital information to the unions. The Board found that the combination of unfair labor practices away from the bargaining table, together with dilatory tactics at the negotiating sessions, foreseeably caused employee dissatisfaction with their union representatives. Consequently, the Board agreed with the ALJ that Radisson was not privileged to withdraw recognition from the unions on the basis of Ogren's filing of the decertification petition. Because we cannot say that this conclusion is unsupported by substantial evidence on the record as a whole, we uphold the Board's determination that the decertification petition was tainted and that Radisson was not privileged to withdraw recognition from the unions. *See Carmichael Constr. Co.*, 728 F.2d at 1139.

Accordingly, we affirm the decision of the Board and order that the decision be enforced.