OMAHA TYPOGRAPHICAL UNION, NO. 190, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

World Publishing Company, Intervenor-Respondent.

No. 75-1833.

United States Court of Appeals, Eighth Circuit.

Submitted May 12, 1976.

Decided Dec. 9, 1976.

· Robert E. O'Connor, Sr., and Robert E. O'Connor, Jr. (argued) and J. Patrick Green, Eisenstatt, Higgins, Kinnamon, Okun & Stern, P. C., Omaha, Neb., for petitioner.

John S. Irving, Jr., Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Michael S. Winer and Andrew F. Tranovich (argued) Attys., National Labor Relations Board, Washington, D. C., on brief, for N. L. R. B.

Paul S. Kuelthau, St. Louis, Mo., Frederick B. Allen, Jr., Seward, Neb., and Stanley R. Strauss (argued) and Michael J. Bartlett, Washington, D. C., on brief, for intervenor.

Before BRIGHT and WEBSTER, Circuit Judges, and TALBOT SMITH, Senior District Judge.*

WEBSTER, Circuit Judge.

Omaha Typographical Union No. 190 petitions this Court to review the order of the National Labor Relations Board dismissing

* The Honorable Talbot Smith, Senior District Judge, Eastern District of Michigan, sitting by designation.

a complaint filed against World Publishing Company. Two issues are preserved in this petition: (1) whether there was substantial evidence to support the Board's finding that the company bargained with the union in good faith with respect to new technology and therefore did not violate § 8(a)(5) and (1) of the National Labor Relations Act; and (2) whether the Board's finding that the payment of bonuses to certain nonstriking personnel during the ensuing strike did not violate § 8(a)(1) of the Act was supported by substantial evidence. We find that there was substantial evidence in the record to support the findings of the Board in both instances and accordingly dismiss the petition.

## I. *Good Faith Bargaining*

The objective facts as they came to the Board are largely undisputed. The union relies principally upon the inferences of company bad faith which it contends are established by the evidence. The company publishes the Omaha World Herald, a daily newspaper. Its relationship with the union covers more than fifty years. In recent years it has become possible to automate a substantial amount of the work performed by the company's composing room employees, who comprise the bargaining unit represented by the union. In 1972, the company was using both "hot type" and "cold type" processes in its composing room.[1] The advent of optical character readers, commonly called scanners, promised to introduce an even greater degree of automation into the composing room.[2]

The August 1, 1972, collective bargaining agreement carried with it a memorandum that provided that if the company purchased a scanner or related equipment it would be used only on an experimental basis, but if the company used the equipment for production purposes in the composing room, its application would be subject to negotiation.

Soon after the execution of the August, 1972, bargaining agreement, the company informed the union that a scanner had been purchased which would be used initially to capture classified billing information. The union's response was that if the company were to use the scanner for production, it would be subject to negotiation; the company agreed. By late November, 1972, as the union and the company entered negotiations for a new contract, the company was in a position to consider using the scanner to scan news copy and suggested to the union negotiators that they ascertain the bargaining position of the international union relative to the company's use of the scanner. The scanner arrived in early December, 1972, and, in response to an inquiry by the company, the union advised that after consultation with the international union, the union was claiming all input into the scanner as work within its jurisdiction.

While numerous subjects were discussed in the twenty-eight bargaining sessions which marked the extended negotiations in this case, the central concern was the future use and control of presently available technology. For the company the interests to be furthered were control of costs and ability to compete profitably in a narrowing market. For the union the interests at stake were the preservation of jobs and the translation of new technology into new or at least substitute work for its members.

1. The "hot type" process, as used by the company before incorporation of the scanner, involved a bargaining unit member who used a keyboard device to transfer copy to perforated paper tape. The tape was then inserted into a linotype machine, which produced traditional lead type for use in publication. The "cold type" process, a more recent development, involves the use of photo composition machines which produce printing plates of photographed material on a mock-up form assembled by cut and paste methods.

2. The scanner eliminates the need to reset into type manually copy which has been produced elsewhere. While it is necessary to introduce certain minor coding to identify punctuation and spacing, clean copy that is "scanner-ready" can be used directly by the machine, which in turn automatically translates the copy into a coded paper tape which in turn can be used to produce copy from either a hot metal linotype machine or a cold type photo type setting machine.

The stakes were high. For the company, a significant reduction in the use of skilled labor was a distinct possibility; speed; accuracy and simplicity were hoped-for by-products of the new technology. Of no small importance was the opportunity to eliminate the unproductive practice of "reproduction," the after-the-fact keyboarding of copy which had come to the composing room in print-ready form.[3] The union, on the other hand, saw the new technology as a menace. It sought to exclude the scanner from the printing operation unless only bargaining unit members were allowed to operate it and produce copy for it.

The bargaining itself divides into two phases: first, the period from November 8, 1972, to May 4, 1973 (from the first bargaining session to the beginning of the strike), and second, the period from May 31, 1974, to July 25, 1974 (from resumption of bargaining during the strike until the final, unsuccessful bargaining session). The administrative law judge and the Board found that the employer had bargained in good faith during each period. We examine the evidence for each period separately.

*Pre-Strike Negotiations.*

In its first written proposal, made on February 1, 1973, the company proposed that the operation and maintenance of the scanner, as well as the preparation of advertising and news copy for scanner use, be performed outside the composing room by nonunit employees. The union expressed concern that this proposal would not only reduce the amount of work available but would take existing work from the bargaining unit. On February 13, 1973, the company responded with a second proposal under which bargaining unit employees would operate the scanner when it was used in the composing room and would maintain the scanner, except when maintenance was performed by the manufacturer or when the scanner was used for other than composing room purposes. The union demanded the

right not only to maintain and operate the scanner but to do all the coding and typing of copy processed by the scanner. The company adhered to its February 13 position; at the March 20 meeting, the union presented a counter-proposal in which it expressed a willingness to waive jurisdictional claims to scanner-ready copy prepared by the classified advertising department except as to coding and retyping of any such copy. This produced a "best offer" from the company on March 21. It was the same offer as made on February 13 and March 20, except that it included a provision that the company could install typewriters in the composing room to be used as directed by the foreman. The union members rejected this contract at a meeting on April 1, 1973.

When bargaining resumed on April 4, the union proposed that advertising copy taken over the telephone by ad-takers in the classified advertising department and copy containing "the original keystroking" of ad salesmen be accepted "scanner-ready" for further processing by the composing room. Since this proposal would have precluded scanner use of scanner-ready news copy, it was rejected by the company on April 13. The company renewed its "best offer" in a final offer on April 13, 1973. The offer was rejected and the strike began on May 4, 1973. It is undisputed that an impasse had occurred.

The effect of automation on the bargaining unit was a mandatory subject of collective bargaining and the company had a statutory duty to confer in good faith with the union over the issue. 29 U.S.C. § 158(a)(5) and (d). *NLRB v. Columbia Tribune Publishing Co.,* 495 F.2d 1384, 1391 (8th Cir. 1974). The Board is charged in the first instance with determining whether there may be inferred from the evidence viewed as a whole a motive or state of mind lacking the necessary element of good faith. *See NLRB v. Reed & Prince Mfg. Co.,* 205 F.2d 131, 139–40 (1st Cir.), *cert. denied,* 346

---

**3.** If advertising copy came to the composing room in print-ready form, it could be used by the company immediately, without being reset. The copy would be retained after publication,

however, and would later be reset by journeymen. The copy produced in this way was useless to the company, and would be discarded immediately.

U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953). In reviewing the evidence in this case, the Board took into consideration not only the evident give and take which characterized the efforts of the company and the union to come to grips with the impact of automation upon the company and the bargaining unit, as reflected in the proposals and counter-proposals discussed *supra,* but also the efforts of the company to minimize the potential injury to current members of the bargaining unit. Thus, on February 1, 1973, the company proposed an element of job security by providing that severance pay would be awarded to any employees laid off because of the scanner. When the union insisted instead upon a lifetime job-security clause, the company promptly substituted a proposed guaranteed employment security for the life of the agreement, which was later extended to a period to normal retirement age of sixty-five and so long as the parties had a contractual relationship. (The relationship with the union at that time had extended over a period of fifty years.) Numerous other proposals of the company were moderated to accommodate union objections and numerous requests of the union were accepted or compromised on matters not relating to the scanner. It is unnecessary to detail them here. On this record, we cannot say that the Board erred in refusing to infer bad faith from the company's hard bargaining to impasse on a mandatory subject of bargaining of major importance to the economic well-being of the company.[4]

4. The union contends that training of nonunit employees to work on composing room work was evidence of bad faith. This contention is without merit. The company had put the union on notice at its first bargaining session in November, 1972, that this training was going on, a precautionary practice which it had followed for years with the knowledge of the union. In December, the company advised the union that it was training typists in the advertising department to prepare scanner readable billing information. This work was outside the scope of the bargaining unit's work and was not a mandatory subject of bargaining. *Allied Chemical Workers v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971). The Board properly drew no inference of bad faith from this conduct. The circum-

## Negotiations During Strike.

Approximately one year after the strike commenced, negotiations were resumed. The company was negotiating a plantwide revision of loss of time insurance benefits, and the union was asked to participate. The union countered with a proposal concerning the full contract, and the company, on July 22, 1974, in reply submitted its new proposed terms for a complete contract. This proposal was less beneficial to the bargaining unit than the last best offer made in 1973. In the new proposal, the recognition clause was modified to cover "employees" rather than "journeymen and apprentices." The company also proposed that wage rates be renegotiated to reflect the less skilled job classifications. The proposal did not incorporate the international union laws into the contract, as did the former agreement, and it would have granted more authority to the foreman. Two provisions were more favorable to the union: the proposal would protect reinstated strikers under the job protection guarantee and would eliminate, as the union had previously demanded, the requirement of a contractual relationship for the continuance of the guarantee. The company invited the union to submit a counter-proposal, but the union declined to follow up with negotiations and no subsequent bargaining sessions were held.

■ The Board correctly held that no inference of bad faith should be drawn

stances under which the strike occurred likewise afford no inference of bad faith when viewed in all of the circumstances of the case. An impasse had clearly been reached. The company was entitled to go forward with its plans. *American Federation of Television and Radio Artists v. NLRB,* 129 U.S.App.D.C. 399, 395 F.2d 622, 624 (1968). The union was expressing resistance to the final offer in terms of unauthorized chapel meetings. The membership had formally voted to strike the company on April 29, 1973, and subsequently had held two unauthorized chapel meetings. The final announcement simply called upon the union members to choose between the final offer and undertaking an economic strike. *Cf. NLRB v. Movie Star, Inc.,* 361 F.2d 346, 349 (5th Cir. 1966).

from the modification of a former final offer to reflect substantially changed conditions which occurred during the year in which the union was on strike. *See NLRB v. Alva Allen Industries, Inc.*, 369 F.2d 310, 318 (8th Cir. 1966); *Caroline Farms v. NLRB*, 401 F.2d 205, 211 (4th Cir. 1968); *Collins & Aikman Corp. v. NLRB*, 395 F.2d 277, 282–83 (4th Cir. 1968); *Warehousemen & Mail Order Employees, Local No. 743 v. NLRB*, 112 U.S.App. D.C. 280, 302 F.2d 865, 868–69 (1962); *NLRB v. Minute Maid Corp.*, 283 F.2d 705, 711 (5th Cir. 1960). The finding of the administrative law judge, adopted by the Board, was as follows:

But the situation did not stay the same. . . . The dire forebodings of the Union negotiators prior to the strike that typists could not do a satisfactory job had been disproven and [the company] has been successfully publishing its newspaper using untrained or relatively untrained help. The insistance [sic] throughout negotiations by the Union that all journeymen be trained in the various activities had given way to the use by [the company] of specialists to do the various jobs, persons trained to do but one job and left on that job. In short the economic background against which [the company] was negotiating had substantially changed during the period of the strike and it had a right to capitalize on the fact by negotiation for the conditions under which it had found it could successfully operate.

Substitution of bargaining concessions during negotiations is not a *per se* violation of the Act. *Philip Carey Mfg. Co.*, 140 NLRB 1103, 1126, 52 LRRM 1184 (1963), *enforced in part, Philip Carey Mfg. Co. v. NLRB*, 331 F.2d 720 (6th Cir.), *cert. denied*, 379 U.S. 888, 85 S.Ct. 159, 13 L.Ed.2d 92 (1964). It is difficult to understand how the union can contend in light of all the circumstances that the new proposals were necessarily made in bad faith, especially since the company's willingness to bargain in good faith with respect to its invitation for counter-proposals was never seriously tested by the union. *See Laclede Gas Co.*, 171 NLRB 1392, 1394, 69 LRRM 1075 (1968).

## II. *Payment of Bonuses*

In the course of the lengthy strike, a few strikers returned to work. Other employees from other divisions and units of the company plant were placed in the composing room to perform the duties previously performed by members of the bargaining unit on strike. In the beginning, an unusual number of long hours were required to insure publication of the newspaper. Bonuses were paid on a selective basis to those who had contributed the extraordinary effort to maintain publication. These bonuses were paid not only to composing room personnel but to personnel in other departments who were likewise saddled with long hours. Some who filled in for persons assigned to the composing room were also paid bonuses.

One hundred seventy composing room employees went out on strike on May 4, 1973. Of the remaining 730 nonstrikers, only 167 received bonuses. Bonuses were given only to employees who were not members of the union's bargaining unit and to supervisors and managers both in and out of the composing room. No bonuses were given to strikers who returned to work and no bonuses were paid to striker replacements. The company did not seek to undermine the union by paying bonuses to employees whom the union represented in other bargaining units. There was no formal effort to publicize the bonuses, and although the union contends that such information would necessarily reach the union members, there is no evidence in the record to that effect.

We consider the payment of bonuses as a possible violation of § 8(a)(1) of the Act, since no violation of § 8(a)(3) was alleged. A § 8(a)(5) violation, although alleged, was not argued in the union's brief; we deem it to have been abandoned.

The bonuses granted in this case do not reflect any disparity in treatment between striking and nonstriking workers of the same bargaining unit. *Cf. NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967); *NLRB v. Great*

*Dane Trailers, Inc.*, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967); *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963). Disparate treatment of members of different units provides no inference of discrimination. There was substantial evidence to support the Board's conclusion that the bonuses were paid for a legitimate business purpose which did not interfere with the exercise or nonexercise of the employees' § 7 right to engage in strikes. While the business purpose may have had a coercive effect in the sense that continued operations of the company reduced the bargaining position of the union and made it more likely that the union would accept the company's proposals, the bonuses under the facts presented here did not operate to prevent members of the bargaining unit from going on strike or to coerce their early return. *See Inter-Collegiate Press v. NLRB*, 486 F.2d 837, 846 (8th Cir. 1973), *cert. denied*, 416 U.S. 938, 94 S.Ct. 1939, 40 L.Ed.2d 288 (1974).

Concluding that the decision of the Board is supported by substantial evidence on the record as a whole and that no error of law appears, we affirm the dismissal of the complaint.