**NEWPORT NEWS SHIPBUILDING AND DRY DOCK COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 78–1452.**

United States Court of Appeals, Fourth Circuit.

Argued April 3, 1979.

Decided July 25, 1979.

Zachary D. Fasman, Washington, D. C. (Raymond J. Schoonhoven, Chicago, Ill., Grant E. Morris, Washington, D. C., Seyfarth, Shaw, Fairweather & Geraldson, Washington, D. C., on brief), for petitioner.

Michael Murchison, N. L. R. B., Washington, D. C. (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Jay E. Shanklin, N. L. R. B., Washington, D. C., on brief), for respondent.

Before BRYAN, Senior Circuit Judge, and WINTER and PHILLIPS, Circuit Judges.

WINTER, Circuit Judge:

Newport News Shipbuilding and Dry Dock Company (hereinafter the "Company") was found by the National Labor Relations Board to have violated §§ 8(a)(1) and (5) of the National Labor Relations Act by insisting, to the point of impasse, on a change in the scope of the collective bargaining unit that had been certified by the Board as a condition precedent to agreement on a contract. The Company seeks to set aside this determination and to have us deny enforcement of the Board's remedial order. The Board cross-petitions for enforcement of its order. We think that the Board's findings of fact were supported by substantial evidence and that its application of the law to the facts was correct. We therefore deny the petition to set aside the Board's decision and grant enforcement of its order.

I.

The evidence adduced at the hearing showed that from 1971 to 1977, the Company's design department employees were represented by the Designer's Association of Newport News (hereinafter "DANN").[1]

---

1. The collective bargaining agreement between the Company and DANN described the bargaining unit as "all Senior Designers, Designers, Junior Designers, Technical Aides, Senior Design Aides, Design Aides, and Apprentices (assigned to the design departments) employed in the Company's design departments and operations on Washington and Marshall Avenues in Newport News, Virginia, excluding all office and clerical employees not assigned to or supporting design departments, inspectors, optical detailers, and all other employees in said department and operations and excluding confidential employees, supervisors, and guards."

In 1976, the United Steelworkers of America, Local No. 8417, AFL–CIO–CLC (hereinafter the "Union"), conducted an organizational campaign among these employees, and on November 18, 1976, it filed a petition with the Board for certification as their collective bargaining representative. The Company responded that it would be· willing to waive hearing on the petition and agree to a stipulated election if certain of the employees that had been included in the DANN bargaining unit were excluded from the voting unit—namely, those employees who, "although classified as a Senior Designer, Designer, Junior Designer, Technical Aide, Senior Design Aide, or Design Aide, are actually performing work as Testers and/or doing purchasing work, budgeting and/or accounting work." The Company's proposal proved unacceptable, and on December 7, 1976, a hearing was held on the petition. At the hearing, the Company withdrew from its position on the scope of the voting unit in order to expedite the election, but indicated that it might raise the issue at a later time. Thereafter, the parties entered into a Stipulation for Certification upon Consent Election, an election was held, and on January 25, 1977, the Union was certified by the Board as the exclusive representative of the employees in the stipulated unit.[2]

Negotiations over a new collective bargaining agreement took place between January 27 and March 31, 1977. At the second bargaining session, the Union presented a proposal defining the bargaining unit in part as "all individuals occupying clerical, technical and professional jobs in the Company for whom the Union is certified." [3] The Union's chief negotiator acknowledged that this language was not the same as the language in the certification, but maintained that the Union intended by this verbiage to insure that all the employees who voted in the election were covered by the proposed contract. At the next bargaining session, the Company submitted a counter-proposal which described the bargaining unit in the same fashion as the Board's certification, except that it substituted the words "draftsmen" and "drafting" wherever the words "designers" and "design" appeared in the certification.[4] The Company's spokesman explained that the purpose of the change was to reflect more accurately the type of work performed by the employees in the unit.

The Union negotiators opened the following bargaining session by expressing their fear that the Company's counter-proposal would remove from the unit several hundred employees who had voted in the election, namely those employees who had been classified as designers but did not in fact do

2. The stipulated unit, which differed from the DANN bargaining unit only in minor respects, included: "All Senior Designers, Designers, Junior Designers, Technical Aides, Senior Design Aides, Design Aides, and Apprentices (Assigned to the Design Departments) employed in the company's Design Departments and Operations on Washington and Marshall Avenues in Newport News, Virginia, excluding all office and clerical employees not assigned to or supporting Design Departments, Inspectors, Optical Detailers and all other employees in said department and operations and excluding confidential employees, guards and supervisors as defined in the Act."

3. The full text of the Union's proposal was as follows: "The term 'employee' as used in this Agreement applies to all individuals occupying clerical, technical and professional jobs in the Company for whom the Union is certified by the National Labor Relations Board as the exclusive collective-bargaining representative;

the term 'employee' does not include office and clerical employees not assigned to or supporting design department, inspectors, optical detailers, and all other employees in said department and operations and excluding confidential employees, supervisors, and guards."

4. Thus: "The bargaining unit of employees covered by this Agreement is: all Senior Draftsmen, Draftsmen, Junior Draftsmen, Technical Aides, Senior Draftsmen Aides, Draftsmen Aides, and Apprentices (assigned to the drafting departments) employed in the Company's drafting departments and operations on Washington and Marshall Avenues in Newport News, Virginia; excluding however, all office and clerical employees not assigned to or supporting drafting departments, inspectors, optical detailers, and all other employees in said drafting and/or design departments and operations and excluding confidential employees, supervisors and guards."

drafting work. In response, the Company denied that such was its intention and stated that it was simply changing a job title. When the Union suggested that the parties resolve the dispute by changing the draftsman terminology back to designer terminology, the Company replied that it did not intend to. During a subsequent meeting, the Union spokesmen reiterated their fear that the change in the unit description would result in a diminution of the bargaining unit. Apparently upset, one Company representative said that, since the Company had been accused of trying to take some people away from the Union, he was going to prove that the Union was right and was going to "get this unit down to a reasonable size." The representative added that he was not attempting to "do in" the designers but was merely trying to run the Company on a more efficient basis.

At the last meeting between the parties, the Company submitted its "final offer," which was conditioned, *inter alia*, on acceptance of its proposed definition of the bargaining unit. The Union caucused and voted unanimously not to accept the offer unless the Company changed its position on the unit description. When the Company was asked whether it was adamant about the description, the Company responded that it was.[5] That evening, the Union membership voted overwhelmingly to reject the Company's offer and to commence a strike the following day, April 1, 1977. The strike was still in progress at the time of the administrative hearing.

On the basis of these facts, the Board concluded that, by conditioning agreement upon a change in the certified unit, the Company refused to bargain collectively with the Union as required by §§ 8(a)(1) and (5) of the Act. The Board also determined that the strike called by the Union was caused by the Company's unlawful conduct and, as such, constituted an unfair labor practice strike. Accordingly, the Board ordered the Company to cease and desist from the unfair practices found, to bargain in good faith with the Union, and to reinstate those strikers who desired to return to work.

## II.

It is well settled that insistence on a change in the scope of the unit certified by the Board violates § 8(a)(5) of the Act. This is so because § 8(a)(5) makes it unlawful for an employer to refuse to bargain collectively with the representatives of his employees and § 9(a) provides that the representatives elected by the majority of the employees in the unit found appropriate by the Board—i. e. those representatives certified by the Board—shall be the exclusive representatives of *all* the employees in the unit. *See, e.g., N.L.R.B. v. Southland Cork Co.*, 342 F.2d 702, 706 (4 Cir. 1965). In addition, the duty to bargain extends only to "wages, hours, and other terms and conditions of employment" as specified by § 8(d), and insistence upon agreement as to non-mandatory subjects of bargaining has been construed by the Supreme Court as a refusal to bargain about mandatory subjects in violation of § 8(a)(5). *See N.L.R.B. v. Woodster Division of Borg-Warner Corp.*, 356 U.S. 342, 349, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958). The description of the bargaining unit is not a mandatory subject of bargaining. *See, e.g., National Fresh Fruit & Vegetable Co. v. N.L.R.B.*, 565 F.2d 1331, 1334 (5 Cir. 1978).

During the contract negotiations in the instant case, the Company attempted to alter the unit description by replacing the words "designers" and "design" with the words "draftsmen" and "drafting". The record does not disclose how many of the employees who had voted in the election actually performed design, as opposed to drafting, work. However, there was testi-

---

5. A Company negotiator testified that, near the close of the meeting, he proposed that the term "senior designer" be changed to "designer," that the term "designer" be changed to "marine draftsman," and that the term "junior designer" be changed to "draftsman." The administrative law judge found it unnecessary to determine whether such a proposal had in fact been made because it was oral, occurred at a late date in the negotiations, and still reflected the Company's insistence on a variation in the unit definition.

mony that the designer classification embraced job functions other than pure designing and drafting, such as testing, liaison, purchasing, and budgeting work. Thus, the administrative judge found that less than half of the employees in the unit performed work which might properly be called design or drafting duties. There was also evidence that the draftsman classification was more limited than the designer classification and that substitution of the term draftsman in the unit description would diminish the size of the bargaining unit. Such a result was all but admitted by the Company's assertion that the substitution was designed to reflect more accurately the type of work done by the employees in the unit. In sum, the conclusion of the administrative judge that the proposed alteration in the unit language could easily exclude some employees from the bargaining unit was supported by substantial evidence.

Indeed, this appears to have been the Company's real intention in making its counter-proposal. Prior to the unit's certification, the Company took the position that all employees who, although classified as designers, were actually doing testing, purchasing, budgeting, or accounting work should be excluded from the unit. This position was subsequently withdrawn in order to expedite the election, but the Company indicated that it might raise the issue anew in another forum. That forum turned out to be the contract bargaining sessions, at which the Company, albeit in a more subtle fashion, attempted to redefine the unit. During these negotiations, a Company spokesman was even provoked to say that he was going to confirm the Union's fears by getting the unit "down to a reasonable size." Finally, the most per-suasive evidence of the Company's intent to reduce the scope of the unit was its insistence on the substitute language. If the Company had believed that its counter-proposal did not alter the bargaining unit, it would not have pressed the substitution so adamantly.

■ That the Company insisted upon the modification is amply demonstrated by the record. When a Union representative suggested that the dispute be resolved by changing the draftsman terms back to designer terms, the Company negotiator responded: "We don't intend to. That would be very simple, I agree with you, but we don't intend to." And, despite repeated Union objections, the Company persisted in its design to alter the unit description until its "final offer" was rejected by a vote of the Union membership. It is clear, then, that substantial evidence supported the administrative judge's determination that the Company insisted upon the variation in the scope of the bargaining unit.

■■ The Company argues strenuously that the substitute language was not intended to modify the unit certified by the Board but to clarify the various job functions which the members of the unit were to perform. The Board agrees that, unless transfers are specifically prohibited by the relevant collective bargaining agreement, an employer may transfer work out of the bargaining unit, as long as the employer first bargains in good faith and is not motivated by anti-union animus. *See University of Chicago v. N.L.R.B.*, 514 F.2d 942, 949 (7 Cir. 1975); *accord, Boeing Co. v. N.L.R.B.*, 581 F.2d 793, 797 (9 Cir. 1978).[6] It does not follow, however, that an employer, under the guise of the transfer of unit work, may alter the composition of the bar-

6. In addition to a definition of the bargaining unit, the Company's counter-proposal contained a section purporting to classify the work to be performed by the unit's members. There is language in the administrative judge's decision suggesting that the allocation of job functions by this latter section was itself violative of § 8(a)(5). Although the Board did not repeat this language in its review of the administrative judge's decision, the Board did leave standing the administrative judge's order that the Company cease and desist from insisting upon a clause which would impair the right of unit members to do such work as they have performed in the past. To the extent that this order precludes the Company from transferring work out of the unit, after bargaining in good faith and without anti-union animus, we deny enforcement.

78

gaining unit. To do so would not only modify the job functions of the various unit members but also affect their right to representation. Thus, implicit in the requirement that the employer bargain in good faith before changing unit work is the assumption that the affected members of the unit will be represented.

█ The Company also contends that it is somehow absolved of any misconduct by the Union's own attempt to alter the size of the bargaining unit by including the word "professional" in the unit definition. We rejected a similar argument in *N.L.R.B. v. Southland Cork Co.*, 342 F.2d 702 (4 Cir. 1965), when we said, "even had the union made such an attempt, and thereby subjected itself to a charge of unfair labor practice, its conduct would be no defense to the charge against Southland." *Id.* at 706. In addition, there is substantial evidence in the record that the Union did not insist on the proposed definition. Although the Union's proposal was never formally withdrawn, there was evidently little discussion on the issue. More importantly, the Union suggested resolving the dispute by changing the draftsman descriptions back to designer descriptions in the Company's counter-proposal. Since the latter proposal did not include the word "professional," the Union obviously was not insistent on that language. In short, the impasse reached was not caused by the Union's position on the inclusion of professionals but by the Company's stand on the substitution of the descriptive word "draftsmen" for "designers".

### III.

█ We think that the evidence clearly supports the Board's finding that the Company's unlawful insistence on redefining the collective bargaining unit as a condition precedent to its agreement to mandatory subjects of bargaining was a proximate cause of the strike. That being so, the strike was an unfair labor practice strike and the strikers, upon their application, are entitled to reinstatement and backpay. *See Mastro Plastics Corp. v. N.L.R.B.*, 350 U.S. 270, 278, 76 S.Ct. 349, 100 L.Ed. 309 (1956).

*ENFORCEMENT GRANTED.*