NEWSPAPER PRINTING
CORPORATION,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Tulsa Typographical Union, Local No.
403, International Typographical
Union, AFL–CIO, Intervenor.

No. 77–1796.

United States Court of Appeals,
Tenth Circuit.

Argued March 13, 1979.

Decided May 19, 1980.

Rehearing and Rehearing In Banc
Denied Sept. 8, 1980.

Lynn P. Mattson, Atty., Tulsa, Okl. (Charles A. Kothe of Kothe, Nichols & Wolfe, Inc., and Byron V. Boone of Boone, Ellison & Smith, Tulsa, Okl., were on the brief), for petitioner.

Janet C. McCaa, Atty., N.L.R.B., Washington, D. C. (Peter M. Bernstein and Marion L. Griffin, Attys., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D. C., were on the brief), for respondent.

Samuel C. McKnight, Detroit, Mich. (Sheldon L. Klimist of Miller, Klimist, Cohen, Martens, & Sugerman, P. C., Detroit, Mich., was on the brief), for intervenor.

Before SETH, Chief Judge, MARKEY *, Judge, and HOLLOWAY, Circuit Judge.

HOLLOWAY, Circuit Judge.

Petitioner, Newspaper Printing Corporation ("NPC"), seeks to set aside and/or modify a decision and order of the National Labor Relations Board, reported at 232 NLRB No. 42 (1977), which modified an earlier ruling by an Administrative Law Judge ("ALJ"), and found that petitioner had violated § 8(a)(5) and (1) of the Nation-

* Honorable Howard T. Markey, Chief Judge, United States Court of Customs and Patent Appeals, sitting by designation.

al Labor Relations Act, 29 U.S.C. § 158(a)(5) and (1) (1976). Tulsa Typographical Union No. 403, ITU, AFL–CIO (herein "Union") intervened with respect to NPC's petition. The Board filed a cross-application for enforcement of its order pursuant to § 10(e) of the Act, 29 U.S.C. § 160(e) (1976).

## I

### The factual background

NPC is an Oklahoma corporation engaged in the printing, sale and distribution of daily newspapers in Tulsa, Oklahoma, where its principal place of business is located. As agent for two competing daily newspaper publishers, NPC is responsible for the printing, solicitation of advertising, production and distribution of both the Tulsa Tribune and Tulsa World. The Union has represented NPC's composing room employees since 1950.[1] NPC also maintains a collective-bargaining relationship with six other unions.

In September 1975 Robert L. Melton, president of the Union, informed Kenneth Fleming, NPC's vice president and general manager, that their current contract was due to expire on January 31, 1976, and requested that negotiations begin immediately for a new collective-bargaining agreement. Fleming replied that any agreement, conditions of employment or other understanding then in effect would terminate as of the date of the expiration of the contract, and offered to bargain for a new agreement.[2]

Negotiations commenced on November 11, 1975, at which time the Union presented its contract proposals. However, discussion at that meeting as well as at a second meeting on December 17, 1975, focused on major technological changes then being considered which the company announced it intended to implement during the life of the new agreement. The changes included replacement of the traditional "hot type" process in the composing room with a new computerized "cold type" process which would result in extensive elimination of unit work and a reduction in the number of unit employees. (R. 2044 n.6).[3]

Fleming also indicated that because of the introduction of the new technology NPC was desirous of negotiating major changes in the Union's jurisdiction over particular work. In particular, in view of the significant investment the company would be making in new machinery and

1. The "composing room" actually comprises five separate rooms on the third floor of NPC's building. (R. 2043 n.5). The most recently expired collective-bargaining agreement between the parties, which ran from February 1, 1973, to January 31, 1976, described the unit as follows:

    SEC. 3. Jurisdiction of the Union and the appropriate unit for collective bargaining is defined as including all composing room work and includes classifications such as hand compositors, typesetting machine operators, makeup men, bank men, proofpress operators, proofreaders, machinists for typesetting machines. . . .
    (R. 2040 n.1).

2. The Administrative Law Judge found that the language used by Fleming was substantially similar to that utilized by the Union in two previous contract termination/reopening notices to the company, and that it was chosen in order to assure that the expiring contract would be completely open to negotiations. (R. 2041 n.2).

3. Under the "hot type" process, hard copy or typewritten material is sent from the newsroom or classified ad room to the composing room. Bargaining unit employees then cut, distribute, retype or rekeyboard the hard copy in preparation for further phototypesetting or linotype operations. With respect to the latter, a keyboard device is used to transfer the copy to perforated paper tape. The tape is then inserted into a linotype machine which produces traditional lead type for use in publication. (R. 2043–44). See also, Omaha Typographical Union, No. 190 v. N.L.R.B., 545 F.2d 1138, 1140 n.1 (8th Cir.).

    In N.L.R.B. v. Columbia Tribune Publishing Co., 495 F.2d 1384, 1386 (8th Cir.) the "cold type" process was described as follows:
    "Cold type" is a process by which type is prepared by simply pasting printed material on a mat which in turn is photographed in a manner that transfers the image to a metal plate which when exposed to acid is etched into a finished plate ready for the pressroom. The cold type process eliminates the highly complicated linotype procedure. Consequently, it does not require any of the skilled labor necessary to the hot metal process.

processes NPC wanted complete flexibility in assigning jobs, in placing the new equipment and determining who would operate it. The Union expressed concern with the new technology's effect on the bargaining unit, the extent of potential job displacement, and the right of unit employees to operate the new equipment. Fleming attempted to allay these fears by again advising the Union, as he had previously done between the first two meetings, that the conversion to new equipment and processes would not take place instantaneously, but rather would be gradually implemented in phases.[4]

The parties met for the third time on January 14, 1976, and discussion of these matters continued. Fleming attempted to respond to the Union's formal request for information regarding the new technology which he had received on or about January 7. At this meeting Fleming presented NPC's proposed extensive jurisdiction-unit language changes which are essentially expressed in the first paragraph:

> The jurisdiction of the Union and the appropriate unit for collective bargaining is defined as including only those employees engaged in all work which the Employer may from time to time designate to be performed in the Composing room. It is the express intention of the Employer to accomplish his complete production needs in the manner which he determines to be the most effective and economical method to fulfill the work requirements.

(R. 2050, 2077). Fleming suggested that because the language had been necessitated by the nature of the planned technological changes, it differed considerably from the historic contract language and that the Union would probably want to carefully examine the language before responding. Union negotiator Jobe agreed that this would be advisable, and the parties agreed to meet again the following week.

At the fourth meeting on January 21, 1976, the Union inquired whether NPC had considered or would consider proposing a guaranteed number of jobs in the composing room throughout the term of the agreement. Fleming replied that he would be happy to negotiate along these lines. At one point in the meeting Union negotiator Jobe stated that the Union had studied NPC's proposed unit jurisdiction clause, and that "there's no way in hell the Union could ever accept it, that to do so would be to kill the Union." Later in the meeting Union negotiator Melton observed that despite considerable discussion on all major issues, no progress was being made. Fleming stated that it looked as if the parties had reached or were about to reach an impasse. According to Fleming, Jobe then replied, "Hell, call it what you want, impasse, deadlock or whatever—we are, without question, locked up on this thing. We're not making any progress." (R. 2053).[5]

The parties met again on January 28, 1976. Fleming explained that NPC was not

---

**4.** The first phase, which was to be completed by September, 1976, entailed the total conversion of the composing room to "cold type." (Apparently, some phototypesetting equipment had previously been introduced into the composing room). The second phase envisioned installation of a large and complex general-purpose computer system which would be used in conjunction with phototypesetting work and also for billing and other business purposes. Lastly, both the newsroom and classified advertising room would be connected to the computer system by means of video display terminals. This would enable newspaper copy (ads or news articles) to be electronically transmitted directly from the newsroom and classified ad room terminals to the general purpose computer for storage and recall. The estimated time of completion of the latter two phases was May, 1977, and August 1, 1977, respectively.

**5.** At the hearing before the Administrative Law Judge, Jobe categorically denied that either he or any member of the Union negotiating committee made any statement to the effect that an impasse had been reached or that the parties were deadlocked. (R. 101). However, the Administrative Law Judge credited Fleming's testimony, and found that Jobe and/or negotiator Melton made such statements at both the January 21, 1976 meeting and later meetings.

The ALJ's finding that FLeming was a highly credible witness was based on (1) his impression that Fleming had a vivid recollection of all of the negotiations (Fleming had made complete minutes of each bargaining session and referred to them during his testimony to refresh his recollection); (2) the fact that the record did not show that the minutes failed to support Fleming's testimony in various material respects; and (3) the fact that none of the

attempting to limit the Union's historic jurisdiction which would continue to be commensurate with the physical boundaries of the composing room, but merely wanted to update the jurisdictional language in preparation for the new technology. He presented the Union with a letter, in which the company requested to be notified on or before January 30 as to whether the Union would accept or reject NPC's proposal. The letter advised that if the Union did not accept the company's proposal by that date, the company wished to withdraw its proposals and submit a counter-proposal on February 1. The meeting ended with no progress being made on the jurisdictional issue, as did the next session the following day, January 29.[6]

Having received no communication from either the local or International Union[7] by February 2, on that day Fleming sent a letter to Melton which stated in part:

> In light of the fact that the contract with your Union expired by its terms and notification on January 31, 1976, and pending execution of a new agreement or a continuation of the existing impasse, no provisions, past practices or obligations that existed under the prior contract will be effective.
>
> We announce the following work relationships that will exist not as a contractual understanding but work practices as follows: . . . .

The letter went on to state that there would be no changes in wages or hours, but a number of unilateral changes in working conditions were announced.[8] (R. 2057, 2079–80).

The parties met again on February 4, at which time Fleming explained that it had been necessary to institute the new rules and guidelines as he had not been advised that assistance from the ITU was forthcoming. He made it clear that the company wanted to continue to negotiate and reach an agreement on all issues. That afternoon ITU representative Boris attended the meeting, and thereafter became the chief negotiator for the Union. Boris requested that NPC withdraw the letter of February 2 and that the parties adhere to the terms of the old contract pending negotiation of a new agreement. Fleming replied that he did not regard the letter as constituting an impediment to continued negotiations and refused to rescind the letter. When Boris stated that NPC might be committing an unfair labor practice, Fleming declared that an impasse had been reached and that NPC was exercising its rights. (R. 2058).

Further negotiating sessions were held during the next seven months, but the parties were unable to reach an agreement. Although virtually all contract provisions were discussed during the course of these negotiations, the major efforts concerned the jurisdictional language. This was recognized as the overriding issue and it remained the primary obstacle to the negotiation of a new agreement. (R. 2059). Fleming asserted that the jurisdictional clause

---

various other members of the Union negotiating committee who attended the bargaining sessions were called as witnesses to corroborate Jobe's testimony. (R. 2053 n.12).

6. At the January 29 meeting the Union proposed that NPC guarantee 180 composing room jobs in 1976, and that the guaranteed figure be reduced by five each year until a minimum guarantee of 145 jobs resulted. Fleming replied that attrition alone would result in a more rapid reduction and suggested that the Union submit another proposal. Jobe replied that for internal union reasons, it would be better if NPC, rather than the Union, proposed to guarantee fewer jobs. (R. 2055–2056).

7. Fleming raised questions about the authority of the Union negotiating committee at various times. As he had done repeatedly, shortly be-

fore expiration of the contract Fleming again asked that the committee request ITU assistance.

8. Under the heading "Working Conditions," the letter in relevant part, stated that:

> It is the express intention of the Employer to accomplish his complete production needs in the manner which he determines to be the most effective and economical method to fulfill the work requirements.
>
> In this connection, Management shall exercise the right to cease any procedure or remove any equipment from the composing room, in the interest of efficiency.
>
> For details of the changes in working conditions see note 16, *infra.*

was designed to provide NPC with the necessary flexibility to operate most efficiently, particularly for the purpose of accommodating the changes that would be wrought by the new technology. NPC wanted the unequivocal right to both remove any work from the Union's jurisdiction, and to place new equipment and process in the composing room. (R. 2059). The Union took the position that NPC's demand for the right to unilaterally determine what work should remain in the composing room and thus within the Union's jurisdiction, and who should be in the unit, made it impossible for the Union to know for whom it was bargaining. (R. 2059).

On June 11 a federal mediator who had been assisting the parties declared that the negotiations were hopelessly deadlocked, citing the jurisdictional issue as the major area of disagreement. (R. 2060 and n.14). Negotiations ceased on August 26.

On these facts the Board accepted the finding of the ALJ that the parties reached a bargaining impasse on January 21, 1976, and that the principal cause of that impasse was their inability to resolve their jurisdictional differences. (R. 2069, 2093). Unlike the ALJ, however, the Board concluded that by insisting to the point of impasse on its proposed jurisdiction-unit clause, NPC had refused to bargain in good faith in violation of § 8(a)(5) of the Act.

The Board's reasoning was two-fold: (1) that the proposed clause would have given NPC unilateral control over the scope of the unit; and (2) that since the definition of an appropriate unit is not a mandatory subject of bargaining, NPC could not lawfully insist to impasse upon modification of the existing clause. (R. 2093–2095). Accordingly, the Board found that each of the unilateral changes instituted by NPC constituted a further § 8(a)(5) violation since the company's insistence on its jurisdiction-unit proposal precluded a genuine impasse on the other issues. (R. 2095).

The Board's order directs NPC to cease and desist from the unfair labor practices found, to restore the employment conditions which were unilaterally changed, to make whole all employees for any losses they suffered as a result thereof, and to bargain in good faith with the Union as the representative of its employees in the appropriate unit as defined in the most recent collective-bargaining agreement. (R. 2096–2097). The company petitions for review of the order and the Board cross-petitions for enforcement, which the intervenor supports.

## II

### *The jurisdiction-unit clause*

#### A

### *The Board's finding on the wording of the clause*

■ The complaint alleged, *inter alia*, that NPC violated § 8(a)(5) of the Act by insisting upon contractual language which failed to sufficiently identify or define the appropriate unit. (R. 2023, ¶ 14). The ALJ analyzed the clause by dissecting it into three component parts: (1) definition of the appropriate unit; (2) union jurisdiction; and (3) management rights. In finding that the clause clearly described the appropriate unit, the ALJ excised the management rights language allowing NPC to determine the work that was to be performed in the composing room so that it read as follows: "The . . . appropriate unit for collective bargaining is defined as including only those employees engaged in all work . . . in the Composing Room." (R. 2061 n.15). Although recognizing that the proposed language, even when doctored, represented a departure from the unit definition then existing and historically recognized by the parties, the ALJ deemed this to be a "clarifying change" upon which NPC had a right to insist. (R. 2062–2063).[9]

9. Historically, the collective-bargaining agreements between the parties defined the appropriate unit in terms of "all composing room work", followed by a detailed, open-ended listing of job classifications and descriptions. *See* note 1, *supra*. This left room for the contention that the unit included employees performing work beyond the physical confines of the

The Board disagreed with both the analysis of the ALJ and his legal conclusions. The Board reasoned that the deleted language was an integral part of the unit definition because it enabled NPC to unilaterally determine who was to be in the unit at will. The Board stated that it "does not certify as appropriate a unit where one party has unilateral control over unit scope." (R. 2094). The Board found the instant situation to be similar to that presented in *Columbia Tribune Publishing Co.*, 201 N.L.R.B. 538, enforced and remanded, 495 F.2d 1384 (8th Cir.), where an employer's refusal to incorporate into any agreement a description of the appropriate bargaining unit was deemed a failure to bargain in good faith.

In challenging the Board's rulings, NPC argues that it merely sought to clarify the unit description, that its proposed language at no time put into question the Union's right to represent the unit, and that the Board erred in equating its conduct with the employer's total failure to accept a jurisdiction-unit clause in *Columbia Tribune*.

Section 9(b) of the Act directs the Board to determine the appropriate unit in each case "in order to assure to employees the fullest freedom in exercising the rights guaranteed by [the Act]." 29 U.S.C. § 159(b). Determination of the appropriate unit is largely within the Board's discretion "whose decision, 'if not final, is rarely to be disturbed' . . . ." *South Prairie Construction Co. v. Local No. 627, Int'l Union of Operating Engineers, AFL–CIO*, 425 U.S. 800, 805, 96 S.Ct. 1842, 1845, 48 L.Ed.2d 382 (per curiam). Moreover, it is clear that

"neither the Board's discretion under section 9(b), nor the employees' right of self-determination under section 7, can be limited by contract between a union and employer." *Sheraton-Kauai Corp. v. N.L.R.B.*, 429 F.2d 1352, 1357 (9th Cir.). Applying these principles, we conclude that we should not disturb the Board's judgment here that the unit description accords one party unilateral control over unit scope and is inherently inappropriate. (R. 2094).[10]

B

*The finding of a § 8(a)(5) violation by NPC's insistence to impasse on the jurisdiction-unit clause*

■ As stated, the Board found the company's insistence to impasse on modification of the existing clause to be an independent violation of § 8(a)(5) of the Act. NPC attacks this finding for two reasons. First, the company claims that the ALJ specifically found that the proposed language was designed to preserve the unit and would not result in the disenfranchisement of any unit employee.[11] Second, NPC argues that the Board has erroneously equated its attempt to retain managerial control over the physical placement of equipment and assignment of work with a plan to control the scope of the unit. The company says that bargaining units are composed of people, not work, and argues that the Board's exclusive authority to determine the appropriate unit under § 9(b) should not be construed as precluding management from seeking the contractual right to transfer work out of the unit as its economic needs dictate, as

composing room. Conversely, NPC's proposed language defined the unit in terms of employees performing work "in the composing room."

The ALJ concluded that this was merely a "clarifying change," after finding that: (1) there was no evidence or showing that the employees performing work beyond the boundaries of the composing room had ever been included in the unit; (2) the practical effect of NPC's language was merely to carefully delimit the unit in accordance with the parties' historical working relationship; and (3) most importantly, no employees would be disenfranchised as a result of the proposed language. (R. 2062).

10. The Board found that the traditional composing room unit described in note 1, *supra* was appropriate for purposes of collective-bargaining, and that the conversion from "hot" to "cold" type affected neither the appropriateness of the unit, nor the Union's representative status. (R. 2094 n.3).

11. These findings appear to be contradictory to the ALJ's previous finding that implementation of the technological changes sought by the company would result in extensive elimination of unit work and a reduction in the number of unit employees. (R. 2044 n.6).

this is a mandatory subject within § 8(d) of the Act, 29 U.S.C. § 158(d). Accordingly, the Board's reliance on representation cases involving a direct frontal attack on the scope of the unit is said to be misplaced.

The ALJ recognized that it may be argued that NPC's "insistence upon a more restrictive unit clause constitutes a deviation from the longstanding jurisdiction-unit description as recognized by the parties. . . ."; nevertheless the ALJ concluded that the practical effect of the change was to delimit the unit more carefully, consistent with the realities of the working relationship, and that NPC's insistence on the clause was not unlawful conduct. (R. 2062–63). The Board essentially adopted the subsidiary findings of the ALJ but made different ultimate findings and conclusions that violations of the Act had occurred. This was within the Board's prerogative, for it is well established that it is the Board's duty to make the final determination as to whether an unfair labor practice has occurred. *M.S.P. Industries, Inc. v. N.L.R.B.*, 568 F.2d 166, 177 (10th Cir.); *Groendyke Transport, Inc. v. N.L.R.B.*, 530 F.2d 137, 139 (10th Cir.). We cannot say that the Board erred in finding that the proposed language modified the existing unit description.[12]

We cannot find support in the cases for NPC's conduct in insisting to impasse on altering the existing contractual unit description.[13] Insistence on a modification in the scope of the bargaining unit, whether established by Board certification or voluntary recognition, is an unfair labor practice in violation of § 8(a)(5) of the Act. *New-*port News Shipbuilding & Dry Dock Co. v. N.L.R.B., 602 F.2d 73, 76 (4th Cir.); *Hess Oil & Chemical Corp. v. N.L.R.B.*, 415 F.2d 440, 445 (5th Cir.), *cert. denied*, 397 U.S. 916, 90 S.Ct. 920, 25 L.Ed.2d 97; *accord, Douds v. International Longshoremen's Association*, 241 F.2d 278, 282–83 (2d Cir.). The reason is that § 8(a)(5) makes it an unfair labor practice for an employer to refuse to bargain collectively with the representatives of his employees and § 9(a) obligates the employer to recognize the union as the exclusive representative of all the employees in the appropriate unit. *Newport News, supra* at 76. *See also, N.L.R.B. v. Southland Cork Co.*, 342 F.2d 702, 706 (4th Cir.).

Accordingly, it has been said that "there [can] be no genuine bargaining as contemplated by the Statute until complete recognition [has] been granted as the Act requires," *McQuay-Norris Mfg. Co. v. N.L.R.B.*, 116 F.2d 748, 751 (7th Cir.), *cert. denied*, 313 U.S. 565, 61 S.Ct. 843, 85 L.Ed. 1524, and that "[t]he parties cannot bargain meaningfully about wages or hours or conditions of employment unless they know the unit of bargaining." *Douds, supra* at 282. Moreover it is equally well established that insistence to impasse upon a non-mandatory subject of bargaining violates § 8(a)(5). *N.L.R.B. v. Wooster Division of Borg-Warner Corp., supra*, 356 U.S. at 349, 78 S.Ct. at 722. And the description or size of the bargaining unit is not a mandatory subject. *See, e. g., Newport News Shipbuilding & Dry Dock Co. v. N.L.R.B., supra* at 76; *National Fresh Fruit & Vegetable Co. v. N.L.R.B.*, 565 F.2d 1331, 1334 (5th Cir.).[14]

12. NPC claims that the Board overlooked undisputed evidence that it offered to guarantee a minimum of 125 jobs to unit employees, which is said to be considerably more than the Union had requested. We think this evidence was properly ignored because the proposal was not made until June, 1976, some four months after the company committed its unfair labor practices here. Moreover, the proposal would have permitted NPC to reduce the 180 unit jobs (R. 2055) to 75 the following year. (R. 1362, 1368, GCX 31 § 38).

13. We find no merit in NPC's contention that its conduct was devoid of anti-union animus and that any control it might have secured over unit scope would have been an unintended byproduct of its pursuit of legitimate business objectives. Good faith is no defense to a refusal to bargain charge where such refusal constitutes insistence to impasse on a non-mandatory subject. *N.L.R.B. v. Wooster Division of Borg-Warner Corp.*, 356 U.S. 342, 349, 78 S.Ct. 718, 722, 2 L.Ed.2d 823.

14. The Fifth Circuit's decision in *Newspaper Production Co. v. N.L.R.B.*, 503 F.2d 821 (5th Cir.), lends no support to the position asserted by the company here. The court there expressly declined to impugn the general rule that

It is true, as NPC contends, that the transfer of work out of the bargaining unit is a mandatory subject of collective-bargaining. *See, University of Chicago v. N.L.R.B.*, 514 F.2d 942, 949 (7th Cir.); *accord, Boeing Co. v. N.L.R.B.*, 581 F.2d 793, 797 (9th Cir.). It is equally clear that the effect of automation on the bargaining unit is a mandatory subject. *Omaha Typographical Union, No. 190 v. N.L.R.B.*, 545 F.2d 1138, 1141 (8th Cir.); *N.L.R.B. v. Columbia Tribune Publishing Co.*, supra at 1391. However, unlike the employer in *Omaha Typographical*, NPC was not content with the right to bargain hard to a genuine impasse and thereafter to implement its proposed technological changes. Rather, in demanding the right to transfer work out of the unit at will, NPC sought to circumvent the Union's right to represent the employees in the composing room unit.

The Union's right to recognition in the appropriate unit, as defined in the collective-bargaining agreement, makes the right to bargain over either of these issues effective. To allow an employer to alter the composition of the unit at will by unilaterally electing to transfer work out of the unit would effectively deprive unit employees of their statutory right to collective representation and bargaining as to the reduction or elimination of their jobs through work transfers or automation. The employer's unilateral action would place those jobs beyond the scope of the unit represented by the Union. The Fourth Circuit in *Newport News Shipbuilding & Dry Dock Co. v. N.L.R.B.*, supra, 602 F.2d at 77–78,[15] rejected an argument virtually identical to the one advanced by NPC here:

The Company argues strenuously that the substitute language was not intended to modify the unit certified by the Board but to clarify the various job functions which the members of the unit were to perform. The Board agrees that, unless transfers are specifically prohibited by the relevant collective bargaining agreement, an employer may transfer work out of the bargaining unit, as long as the employer first bargains in good faith and is not motivated by anti-union animus. *See University of Chicago v. N.L.R.B.*, 514 F.2d 942, 949 (7 Cir. 1975); *accord, Boeing Co. v. N.L.R.B.*, 581 F.2d 793, 797 (9 Cir. 1978). It does not follow however, that an employer, under the guise of the transfer of unit work, may alter the composition of the bargaining unit. To do so would not only modify the job functions

---

"insistence to the point of impasse on restriction or expansion of the bargaining unit is an unfair labor practice." *Id.* at 828 (citations ommitted). Rather, in upholding the Board's determination that the Union was entitled to insist to impasse on expansion of the unit, the court found the rule inapplicable because: (1) the union, which already represented the employer's eight to eleven photoengravers, was selected to represent a new group of three production workers; (2) the expiring contract between the parties provided for inclusion of such a new group of employees in the contract; and (3) the combined unit was concededly appropriate. *Id.* at 824, 828–29. It should be clear that no comparable circumstances are present here to warrant an exception to the general rule.

**15.** NPC argues that *Newport News* is distinguishable from the instant case because: (1) there the employer's proposal would have disenfranchised a significant number of employees from union representation; and (2) the decision turned upon an administrative law judge's findings that the employer intended to reduce the size of the unit. We cannot agree.

In *Newport News* the employer sought to change the unit description by substituting "designers" with "draftsmen," thereby eliminating from the unit employees falling within the former classification, but not the latter. Here, NPC sought to eliminate all job classifications which would have denied union representation to employees in all unit job classifications whose work NPC did not designate to be performed in the "Composing Room." As stated, *note* 11, *supra*, the ALJ found that implementation of the new technology would result in extensive elimination of unit jobs.

In addition, NPC's suggestion that the holding in *Newport News* rested on a finding of anti-union animus is clearly incorrect. The ALJ there expressly found (p. 13) that the employer's insistence on alteration of the unit "was primarily motivated by an economic desire to make the shipyard more efficient by eliminating some of the classifications and job functions in that unit and allowing them to be performed elsewhere . . . ." 236 NLRB No. 218.

of the various unit members but also affect their right to representation. Thus, implicit in the requirement that the employer bargain in good faith before changing unit work is the assumption that the affected members of the unit will be represented.

Finally, NPC contends that the Union was attempting to expand the unit description, and that both parties viewed their respective contract proposals as mandatory. Thus, assuming arguendo that the .clause is non-mandatory, the Union was equally culpable, therefore the company should not be held responsible. We cannot agree.

The proposed agreement which the Union presented at the first meeting between the parties on November 11, 1975, left the existing unit description intact (GCX 8, Sec. 3). The record discloses that the Union resisted to impasse NPC's proposed language on the grounds that it would destroy the unit, and that the company was making it impossible for the Union to determine for whom it was bargaining. (R. 2059). Moreover, both the Administrative Law Judge and the Board agreed that NPC's proposed jurisdiction-unit clause had precipitated the bargaining impasse on January 21, 1976. (R. 2093, 2069–70, 2059–60). Finally, even assuming the Union was seeking to alter the unit, .such conduct is not a defense to the charge against NPC. *Newport News Dry Dock & Shipbuilding Co. v. N.L.R.B., supra*, at 78.

In sum, we sustain the Board's finding that the company refused to bargain in violation of § 8(a)(5) by its insistence to impasse on inclusion of its jurisdiction-unit clause.

### III

*The Board's order*

The Board's order directs the company, *inter alia*, to restore all employment conditions and practices which it unilaterally changed and to bargain in good faith with the union as the exclusive representative of its employees in the appropriate unit as defined in the most recent collective-bargaining agreement. (R. 2096–97). NPC attacks the order on the grounds that it: (1) forces the parties to agree to a substantive contract term dealing with the placement of work in violation of the principles announced in *H. K. Porter Co. v. N.L.R.B.*, 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146; (2) is excessive in that it requires a rollback of all unilateral changes without demonstrating how discussion of the jurisdiction-unit clause tainted impasse over the other subjects; and (3) is punitive because it renders the company's huge capital investment a nullity. We must disagree.

First, NPC's contention that it is being forced to agree to substantive contractual terms is unpersuasive. Nowhere in its order does the Board attempt to compel agreement on work placement or any other subject. On the contrary, the order directs the company to engage in good faith bargaining in the unit the company sought to alter and expressly provides that *"if an understanding is reached,* [to] embody such understanding in a signed agreement." (R. 2097, ¶ 2(b)) (Emphasis added). We have previously observed that *H. K. Porter, supra* "does not impinge on the vitality of the Borg-Warner rule," which upheld the "Board's authority to require a party to sign a contract, agreed upon except as to nonmandatory bargaining subjects," nor does it affect the validity of the Board's remedial orders for violations of that rule. *N.L.R.B. v. Central Machine & Tool Company*, 429 F.2d 1127, 1129 (10th Cir.), *cert. denied*, 401 U.S. 909, 91 S.Ct. 870, 27 L.Ed.2d 807.

Second, NPC's contention that the Board's order is excessive is untenable. As noted, after bargaining to impasse on its proposed jurisdiction-unit language the company announced the institution of a number of unilateral changes in working conditions.[16] The Board found that these

---

16. The changes in question were as follows: (1) NPC reserved the right, in the interest of efficiency, to cease any procedure or remove any equipment from the composing room; (2) no duplication of work was to be performed between departments or employees, and NPC re-

unilateral changes were independent violations of § 8(a)(5) and ordered a "rollback" on all of these changes. The company argues that at most there was a failure to agree on one of these items (Brief of NPC at 40), and that the Board's order was clearly excessive. We sustain the Board's finding that each of the unilateral changes implemented by the company constituted independent violations of § 8(a)(5) and its remedial order directed to these violations.

■ Only a genuine impasse, one not caused by the failure of one of the parties to bargain in good faith, permits an employer to take unilateral action on a mandatory subject without violating the Act. *United Fire Proof Warehouse Co. v. N.L.R.B.*, 356 F.2d 494, 497 (7th Cir.). *Accord, N.L.R.B. v. Pacific Grinding Wheel Co., Inc.*, 572 F.2d 1343, 1349 (9th Cir.). No such genuine impasse was possible here for, as the Board found, the parties acknowledged that the unit jurisdiction clause predominated in the negotiations and was the principal cause of the failure to reach an agreement. (R. 2095).[17] NPC's insistence here on its new version of a jurisdiction-unit clause was in effect a refusal to bargain in good faith

which "precluded a genuine impasse on the other issues." (R. 2095). Hence the unilateral changes implemented were themselves independent § 8(a)(5) violations. (R. 2095). *N.L.R.B. v. Katz* 369 U.S. 736, 743, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230; *N.L.R.B. v. United Nuclear Corp.*, 381 F.2d 972, 976 (10th Cir.). We feel that the order directing abrogation of the unilaterally altered terms or conditions of employment and restoration of the *status quo ante* was within the Board's remedial discretion under § 10(c) of the Act. *See, Fibreboard Corp. v. N.L.R.B.*, 379 U.S 203, 215–16, 85 S.Ct. 398, 405–406, 13 L.Ed.2d 233. In *N.L.R.B. v. King Radio Corporation*, 416 F.2d 569, 573 (10th Cir.), cert. denied 397 U.S. 1007, 90 S.Ct. 1234, 25 L.Ed.2d 420, we observed that:

> The primary responsibility for the formulation of a remedy rests with the Board, and this court will not strike down a proposed remedy, unless it can be said to be oppressive and not designed to effectuate the policies of the Act. *N.L.R.B. v. General Drivers, Chauffeurs, Helpers, Etc.*, 264 F.2d 21 (10th Cir.). It is the function of the Board, not the judiciary,

served the right to determine who would perform the work in the event this occurred; (3) no provisions of the ITU general laws, rules or bylaws would be considered applicable to NPC's work relationships; (4) the Standing Committee was abolished, and although any cases of discipline and discharge arising would continue to be handled through a grievance procedure identical with prior customs, there was to be no arbitration except by mutual agreement; (5) the priority system would only apply to increases or decreases in the work force; competency to perform the job would be determinative. Situations would be staffed and all placements handled exclusively by NPC with competency as the highest criterion for selection and retention; (6) the holding of chapel meetings on company property was prohibited; (7) NPC would not make deductions for any pension plan, but would include an amount equal to $.50/shift (maximum weekly amount $2.50) in each employee's check; (8) only reproduction work required by NPC would be allowed; (9) any full-time regular employee required to serve on jury duty during his normal scheduled working hours would be reimbursed for an amount equal to the difference between the pay received by the court and the pay scale of the employee, and (10) the Joint

Apprenticeship Committee was abolished. (R. 2079–80).

The ALJ found that NPC's elimination of chapel meetings on company premises, and the abolition of the Joint Apprenticeship Committee violated § 8(a)(5) of the Act. (R. 2071–2074). NPC did not file exceptions to the ALJ's decision. Accordingly, these two violations found are not contestable here under § 10(e) of the Act.

17. The ALJ had found that the parties reached an impasse on other issues in addition to the jurisdiction-unit clause. (R. 2070, 2074), and that certain unilateral changes were reasonably comprehended within NPC's pre-impasse proposals and were therefore lawful. (R. 2071–2074).

The Board said the ALJ's finding was "at best tenuous," but concluded that it was unnecessary to resolve the issue. (R. 2095). The Board stated that the jurisdiction-unit clause was always the focus of discussion and was acknowledged by the parties to be the main obstacle to agreement and that "Respondent's insistence on its jurisdiction-unit proposal, which we have found to be a refusal to bargain in good faith, precluded a genuine impasse on the other issues." (*Id.* at 2095).

to determine how the effect of an unfair labor practice may be expunged. *Furr's Inc. v. N.L.R.B.*, 381 F.2d 562 (10th Cir.). Cert. denied 389 U.S. 840, 88 S.Ct. 70, 19 L.Ed.2d 105.

We do not feel that our opinion in *N.L. R.B. v. Process & Pollution Control Co.*, 588 F.2d 786 (10th Cir.) supports the company's position here. In finding a Board order overly broad there we stated that the Board is without authority to enjoin all violations of the Act merely because one violation is found. *Id.* at 792. Rather, "to justify restraint of other violations, it must appear that they bear some resemblance to that which the employer has committed, or that danger of their commission is to be anticipated from the course of his conduct in the past." *Id.* Here, by contrast, the Board found that each of the unilateral changes implemented by NPC constituted an independent violation of the duty to bargain. (R. 2095). Moreover those independent violations occurred after the impasse developed on the jurisdiction-unit clause. Under these circumstances we cannot say that the Board's order is excessive.

Finally, the remedial relief ordered by the Board here is not shown to be economically prohibitive or punitive. NPC failed to proffer evidence that its capital investment will now be wasted. Nothing in the Board's order purports to impede the company's planned conversion from "hot" to "cold" type. Rather, the order merely directs that in implementing the technological changes the company accord the Union its rightful recognition as the representative of all employees in the appropriate unit. We think the Board properly exercised its remedial discretion under § 10(c).

Accordingly, the petition to review and set aside the Board's order is denied and the order will be

ENFORCED.